## STATE OF CONNECTICUT *v.* RICHARD B. CRAFTS
## (13886)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued March 26—decision released July 6, 1993

*Eugene J. Riccio,* special public defender, with whom was *Peter J. McGuinness,* special public defender, for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom were *Walter D. Flanagan,* state's attorney, and *Brian Cotter,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this criminal appeal is the sufficiency of largely circumstantial evidence to support a conviction of the crime of murder. The state charged the defendant, Richard B. Crafts, with having committed the crime of murder in violation of General Statutes § 53a-54a,[1] by killing his wife, Helle Crafts. After an earlier trial resulted in a mistrial because of the jury's inability to arrive at a verdict, the state retried the defendant and a jury found him guilty of murder. The trial court then rendered a judgment sentencing the defendant to a term of fifty years imprisonment. The defendant appeals his conviction to this court pursuant to General Statutes § 51-199 (b) (3). We affirm.

At the trial, the state's theory of the offense was that the defendant had intentionally killed the victim as a result of the deterioration of their marriage. To conceal detection of the crime, the defendant had allegedly devised and executed an elaborate plan to destroy the victim's body. In support of this proposition, the state presented extensive, but primarily circumstantial, evidence describing the couple's marital troubles as well as the defendant's actions during the fall and winter of 1986-1987 to establish that the defendant, with the

---

[1] General Statutes § 53a-54a provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

requisite intent, had murdered the victim. The defendant maintained, to the contrary, that he had not killed his wife, but that he nonetheless did not know her present whereabouts.

The jury could reasonably have found the following facts. Because of the defendant's continued extramarital affairs, the victim contacted an attorney and began divorce proceedings against him. She hired a private detective, who carried out surveillance of the defendant. The detective confirmed that the defendant was involved with another woman, and presented the victim with photographs of the defendant's activities. Not only was the defendant himself aware of the victim's intention to divorce him, but she also had told a number of people of her plans.

The victim's marital troubles would not, however, have led to her voluntary departure from her home and family. The victim was extremely devoted to her children, was planning to seek their custody in the divorce proceedings, and would not under any circumstances have left them voluntarily. Furthermore, the victim warned several people that, if anything unusual were to happen to her, they should not believe that such an event was of her own making.

The victim was last seen or heard from on November 18, 1986, as she was dropped off at her home by a coworker. On the morning of November 19, 1986, the defendant ushered the children and the family's live-in au pair helper from the home at 6 a.m. to leave for his sister's house in Westport purportedly, according to what the defendant told the au pair helper at the time, because of the lack of heat due to a power failure during a snowstorm the night before. The defendant's home, however, had alternative sources of heat, including kerosene heaters, a fireplace and a generator. The victim was not present, and at that time the

defendant explained that she had left earlier, probably to go to his sister's house. In his rush to leave the house, the defendant made no attempt to dress the children for the severe weather and drove through difficult conditions to leave the children with his sister in Westport. Although the victim was not at the sister's house, the defendant neither mentioned her absence nor inquired regarding her whereabouts. The jury could reasonably have inferred that, in light of all of the evidence, the defendant had already killed the victim during the night and was proceeding with the execution of his plan to conceal the crime.

As part of the defendant's plan, prior to the events of November 18 and 19, 1986, he had arranged for the rental of a woodchipper, the purchase of a truck with which to haul the woodchipper, and the purchase of a large freezer. He picked up the freezer on November 17.[2] Although the defendant had wanted to pick up the woodchipper on November 18, he was not able to do so until November 20, when he was able to obtain access to a rental truck as a replacement for the new truck, delivery of which had been delayed. The defendant returned the woodchipper and the rental truck on November 21, 1986. He therefore had the woodchipper, with the rental truck as a towing vehicle, overnight.

On the evening of November 20, 1986, and into the early morning of November 21, several witnesses observed a woodchipper being pulled by a rental truck

[2] The defendant owned an older freezer that was in service at the home until mid-November, 1986. Although the older freezer was never located during the subsequent police investigation—the defendant claimed that the new freezer was a replacement because the older one did not work properly and he disposed of it at a dump site—the jury could reasonably have inferred that the older freezer was used to store the victim's body until the defendant had access to the woodchipper. They could also have inferred that the older freezer was then disposed of so that the police would not find any forensic evidence with which to connect the defendant to the crime.

at various locations in the general area of the defendant's home and, additionally, near the offices of his part-time employer, the town of Southbury. At 6:30 p.m. the woodchipper, being operated by a single individual, was observed near a steel bridge in Newtown. Between 3 a.m. and 4 a.m., the woodchipper was observed at various locations in the vicinity of the same steel bridge, again being operated by a lone individual. At approximately 4 a.m. the defendant, along with the truck and woodchipper, was parked in a Southbury school parking lot. There, a coworker talked to the defendant, who, in response to the coworker's inquiry regarding the woodchipper, replied that he was cleaning up limbs downed in the November 18 storm. Other evidence, however, indicated that no limbs had been downed during that storm and that there was no other existing need for a woodchipper.

State police officers subsequently searched the area near the steel bridge and discovered a number of items relating to the victim. Their initial search uncovered, among piles of woodchips, an envelope bearing the victim's name and blue fabric of a type similar to clothing formerly worn by the victim. Upon a more detailed search of areas containing the woodchip debris, the police found pieces of bone and tissue, a human fingernail and crowns to the victim's teeth. The police also recovered, underwater near the steel bridge, a chain saw that belonged to the defendant. From the chain saw and the separately recovered saw blade they recovered blood, tissue, hair fragments and cotton fibers. Some of these remains partially matched the material discovered at the riverside. Furthermore, the blood, tissue and hair fragments were of categories matching those of the victim.

Thereafter, the defendant offered to different parties various stories regarding his wife's whereabouts, all of which were demonstrated to be incorrect. In addi-

tion to the explanation for the victim's absence on the morning of November 19 offered as he brought his children to his sister's house, he initially told several of the victim's friends that in fact she had gone to Denmark to be with her ill mother. He later began to tell acquaintances that the victim might be visiting her friends overseas. In an interview with the police on December 4, 1986, the defendant indicated that he had last seen the victim on November 19, 1986, but that, at the time of the interview, she might be visiting a friend in the Canary Islands. Besides numerous inaccurate and contradictory statements regarding the victim's whereabouts, the defendant also made several incriminating remarks to acquaintances regarding the police investigation, which the jury could reasonably have found to indicate further a consciousness of guilt. For instance, when advised by his brother-in-law of the state police diving efforts, the defendant replied, "Let them dive. There's no body. It's gone."

Relying on this evidentiary showing, the jury hearing the defendant's case found him guilty of murder as charged. The defendant's appeal challenges his conviction on five grounds. He claims that the trial court improperly: (1) denied his motion for acquittal because his conviction, resting primarily on circumstantial evidence, was the result of impermissible inferences that were not supported by proof beyond a reasonable doubt, thereby denying his right to due process; (2) instructed the jury that it might infer specific intent to commit murder from the mere fact of the death of the victim, thus denying his right to due process; (3) refused to instruct the jury on three lesser included homicides not requiring a finding of intent to kill; (4) admitted into evidence out-of-court statements made by the victim to others; and (5) denied him a fair trial because of extensive pretrial publicity implicating, again, his right to due process. We are unpersuaded.

## I

The defendant claims that his conviction violated the due process provision of the United States constitution[3] because the evidence presented at trial was insufficient to establish his guilt beyond a reasonable doubt. We review such a claim in accordance with a well established two part test. We first construe the evidence presented at trial in a manner favorable to sustaining the verdict, and then determine whether the jury could reasonably have found, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Gomez,* 225 Conn. 347, 350, 622 A.2d 1014 (1993); *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991).

In light of the state's presentation of extensive circumstantial evidence, the principal issue raised by this claim is whether special procedural rules govern the validity of the jury's ultimate findings regarding each element of the crime of murder if, in making these findings, the jury presumably relied upon sets of multiple inferences, in other words, inferences derived from previous inferences. The defendant maintains that recourse to multiple inferences potentially leads to speculative ultimate findings. From this premise, he contends that due process requires that a verdict of guilty depending on such inferences cannot be sustained

---

[3] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

Although the defendant also invokes the due process provision contained in article first, § 8, of the Connecticut constitution, he has provided no separate analysis of his claim under the state constitution. For that reason, we decline to address it. See *State* v. *Reddick,* 224 Conn. 445, 463 n.22, 619 A.2d 453 (1993); *State* v. *Cerilli,* 222 Conn. 556, 572 n.11, 610 A.2d 1130 (1992).

unless each successive inference is itself established beyond a reasonable doubt. We reject this contention.

Due process requires that the state prove each element of an offense beyond a reasonable doubt. *State* v. *Smith,* 194 Conn. 213, 217, 479 A.2d 814 (1984). It follows that insufficiency of the evidence to support a jury's ultimate findings on each of these elements requires acquittal. See *State* v. *Carpenter,* 214 Conn. 77, 83-85, 570 A.2d 203 (1990).

Due process does not, however, require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt. We have regularly held that a jury's factual inferences that support a guilty verdict need only be reasonable. *State* v. *Grant,* 219 Conn. 596, 604-605, 594 A.2d 459 (1991), and cases therein cited. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts. *State* v. *Weinberg,* 215 Conn. 231, 255, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990), and cases therein cited.

The defendant maintains that we have not expressly considered the effect of the conjunction of these two rules, the appropriate *standard of proof* for an inference that is *derived from* another inference. Although he recognizes that we have regularly applied the "reasonableness" standard as the proper measure for the proof of inferences from circumstantial evidence, and have permitted an inferred fact to be the basis of a further inference, he contends that the accumulation of multiple "reasonable" inferences runs the risk of producing ultimate findings that contain "reasonable doubts." This argument rests on the assumption that inferential thinking necessarily proceeds in a pyramid of dependent inferences, so that ultimate findings inher-

ently include the possible alternatives that may exist in the underlying inferences. Invoking this assumption, the defendant claims that the "reasonableness" standard is constitutionally unacceptable because of the risk that compounded alternatives, as yet not excluded beyond reasonable doubt, may be cumulated so as to reduce the jury's ultimate findings to mere speculation. The defendant thus asks us to adopt a new rule requiring each inferred fact to be proven beyond a reasonable doubt before it may be considered a basis for an additional inference.

The defendant's argument that a special standard of proof is required to guard against attenuated probabilities associated with inferences based on inferences is, however, an argument the basis of which we have previously considered and rejected. More than seventy years ago, we concluded, in *Sliwowski* v. *New York, N.H. & H. R. Co.,* 94 Conn. 303, 310-11, 108 A. 805 (1920), that "[t]here is, in fact, no rule of law that forbids the resting of one inference upon facts whose determination is the result of other inferences. . . . It is but a rule of caution; its true function is to guide the court in the exercise of its judgment in determining whether or not evidence offered is too remote . . . or, in making its final decision, in deciding whether the plaintiff has established a reasonable probability." (Citations omitted.) We have adhered to that position, noting that "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." *State* v. *Perez,* 183 Conn. 225, 227, 439 A.2d 305 (1981); *State* v. *Grant,* supra, 604-605; see also 1A J. Wigmore, Evidence (4th Ed., Tillers Rev. 1983) § 37.6, pp. 1060-62, and § 41, p. 1112 n.3.[4]

---

[4] Professor Wigmore's discussion of the validity of inferences that rely upon other inferences methodically explores the argument offered by the defendant here, that "pyramiding" inferences necessarily creates an

The defendant asks us, in effect, to reconsider these precedents as inconsistent with *State* v. *Rodgers,* 198 Conn. 53, 59, 502 A.2d 360 (1985), which requires a jury to be charged that facts, whether basic or inferred, that are essential to proof of an element of a crime must be proved beyond a reasonable doubt. As we explained, however, in *State* v. *McDonough,* 205 Conn. 352, 355, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988): "Where a group of facts are relied upon for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is *only where a single fact is essential to proof of an element* . . . such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt." (Emphasis added.) As restated in *State* v. *McDonough,* supra, the rule of *State* v. *Rodgers,* supra, does not uniformly require inferences drawn from circumstantial evidence to be proven beyond a reasonable doubt. The defendant's position was impliedly rejected by us in *State* v. *Pinnock,* 220 Conn. 765, 771, 601 A.2d 521 (1992), in which we held that "[w]hile the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged

accumulation of "reasonable doubts." Wigmore rejects the argument for two fundamental reasons. First, it is not necessarily accurate to describe inferential reasoning as a linear process of pyramiding conclusions. More accurately, inferential reasoning relies on the entirety of the evidence to support initial and then to reinforce subsequent inferences such that the ultimate conclusions are found beyond a reasonable doubt. Second, even if such an explanation of inferential reasoning is accurate, its application to the factfinding process of our jury system would be extremely difficult because, in order to function properly, in effect, it relies on quasimathematical calculations. Furthermore, such a process would be virtually unverifiable upon judicial review. 1A J. Wigmore, Evidence (4th Ed., Tillers Rev. 1983) § 37.6, pp. 1060–62, and § 41, p. 1112 n.3.

offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt.''

We recognize that courts in other jurisdictions have applied a higher standard of proof for inferences based on inferences.[5] We are nonetheless persuaded that our rule comports with the basic understanding that it is the jury's function to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. *State* v. *Tatem,* 194 Conn. 594, 598, 483 A.2d 1087 (1984). We therefore reject the defendant's claim that the evidence of his guilt was insufficient because it was measured by an impermissible constitutional standard.

## II

The defendant claims that the trial court's instruction regarding intent was improper because it allowed the jury to infer intent to kill from the fact of the victim's death alone. The trial court told the jury: ''You may, but you need not, infer that a person intends that which is the natural, probable consequences of the act in question, that *if he kills a person he intended to kill that person.* You may draw that inference.'' (Emphasis added.) The defendant maintains that this instruction diminished the state's burden of proof and violated his right to due process,[6] and thus requires a new trial, because intent may be inferred only from actions and not from results. Although this instruction may well

---

[5] The cases decided in other jurisdictions to which the defendant points as support for his proposition are not persuasive because each relies on the reasoning that we here reject as unsound. See *New York Life Ins. Co.* v. *McNeely,* 52 Ariz. 181, 192–99, 79 P.2d 948 (1938); *Savarese* v. *State Farm Mutual Automobile Ins. Co.,* 150 Cal. App. 2d 518, 520, 310 P.2d 142 (1957); *People* v. *Clay,* 95 Mich. App. 152, 159, 289 N.W.2d 888 (1980); *State* v. *Lasley,* 583 S.W.2d 511, 516–17 (Mo. 1979).

[6] See footnote 3.

have been improper, we are persuaded that any error was harmless beyond a reasonable doubt in the circumstances of this case.

We review de novo a defendant's challenge to an instruction regarding an essential element of the crime, because due process requires the state to prove each essential element beyond a reasonable doubt. *State* v. *Arroyo,* 180 Conn. 171, 173–74, 429 A.2d 457 (1980). In order to establish murder, the state must prove intent beyond a reasonable doubt. *State* v. *Carpenter,* supra, 82. Intent is typically established by circumstantial evidence. *State* v. *Martin,* 195 Conn. 166, 170, 487 A.2d 177 (1985). Such circumstantial evidence may include inferences drawn from the conduct of the accused. The knowing and volitional conduct of a defendant is probative of his mental state insofar as he may be found to have intended the ordinary and natural consequences of his acts. It is therefore proper for the trial court to instruct the jury that it may, but need not, determine the defendant's intent through reasonable inferences from the defendant's actions. See *State* v. *Palmer,* 206 Conn. 40, 47–49, 536 A.2d 936 (1988).

An instruction on intent that, instead of focusing on inferences to be drawn from the defendant's conduct permits inferences to be drawn from the result of that conduct is problematic because intent cannot be inferred directly from results. The fact that a victim was struck by a bullet would not, in itself, support the inference that the perpetrator intended to kill the victim, because the perpetrator might have acted with a variety of mental states. See footnotes 1 and 7. In this case, similarly, the jury could not properly have inferred an intent to commit murder from the mere fact of the death of the victim, even from her death at the hands of the defendant.

We need not, however, resolve the question whether the court's instruction violated due process by relieving the state of its burden to prove intent, because even if such a charge is improper in isolation, it was harmless beyond a reasonable doubt in the circumstances of this case. A new trial is not required if "[t]he attacked sentence of the charge, when considered within the context of the court's charge on murder, its prefatory instructions on inferences and circumstantial evidence, and the charge as a whole, could not be reasonably construed to require . . . [an improper verdict]." *State* v. *Arroyo,* supra, 180. Immediately preceding the challenged instruction, the trial court declared that "I will shortly discuss with you, the particular crime charged, [and] you will note that it will be the obligation of the state to prove that the defendant acted with a particular intent, the intent to cause the death of another person, the intent to cause the death of Helle Crafts during the commission of the alleged crime. . . . [The statutory section defining murder requires] that the state . . . prove beyond a reasonable doubt with regard to the death of Helle Crafts first that Richard Crafts caused the death of Helle Crafts. That is Helle Crafts died as a result of the actions of the defendant Richard Crafts. And secondly, that Richard Crafts caused the death of Helle Crafts with the specific intent to cause her death. . . . Even if you were to find that Helle Crafts is dead and that the defendant killed her, the mere fact that the defendant killed Helle Crafts does not alone establish his guilt of murder. There can be no murder unless the defendant intended to cause a person's death." In light of the charge as a whole, we conclude that no reasonable juror would have been led to believe that a finding of intent could be premised on the basis of the victim's death alone.

### III

The defendant claims that the trial court improperly refused his request to instruct the jury on the lesser

included offenses of manslaughter in the first and second degree and criminally negligent homicide.[7] Each of these crimes may, by statute, constitute a lesser included offense of murder. General Statutes § 53a-45 (c); *State* v. *Rodriguez,* 180 Conn. 382, 403–404, 429 A.2d 919 (1980). The only difference among these degrees of homicide is the requisite intent. See footnotes 1 and 7. Relying on the fact that the state's evidence of intent was entirely circumstantial, the defendant argues that he has satisfied the requirements for a charge on these lesser included offenses. We disagree.

Although there is no constitutional right to have a jury consider possible lesser included offenses, Connecticut law entitles a defendant to a lesser included offense charge if his request satisfies the four requirements set forth in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). See *State* v. *Herring,* 210 Conn. 78, 104–105, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). The final two criteria of *Whistnant* require that "there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and . . . [that] the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." *State* v. *Whistnant,* supra.

[7] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

General Statutes § 53a-56 provides in relevant part: "(a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

General Statutes § 53a-58 provides in relevant part: "(a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person . . . ."

In *State* v. *Rasmussen,* 225 Conn. 55, 65–73, 621 A.2d 728 (1993), we recently reviewed the standard of evidence required to satisfy these aspects of the *Whistnant* test. We there held that "there must be *sufficient* evidence, introduced by either the state or the defendant, or by a combination of their proofs, to justify a finding of guilt of the lesser offense." (Emphasis added.) Id., 67–68. We reviewed our previous cases, such as *State* v. *Falby,* 187 Conn. 6, 30, 444 A.2d 213 (1982), on which the defendant relies, and expressly rejected the proposition that a defendant is entitled to instructions on lesser included charges based on merely theoretical or possible scenarios. *State* v. *Rasmussen,* supra, 66–67.

In light of *Rasmussen,* we conclude that the trial court correctly decided that there was insufficient evidence to justify the defendant's request for instructions on any of the lesser included offenses of murder. The evidence to which the defendant points in support of his contention consists of the victim's reactions and the couples' arguments regarding the defendant's extramarital affairs, supposedly suggesting the hypothesis that the two had a confrontation on November 18, 1986, during which the defendant, unintentionally, killed the victim. The defendant insists that the fact that he had not yet obtained the woodchipper, which the state claims was a part of the defendant's arranged plan, until November 20, 1986, supports this contention. That evidence, however, cannot be viewed in isolation. It was inextricably linked to the other evidence that the defendant, prior to the victim's return home on November 18, had arranged for the rental of the woodchipper as part of his prearranged plan to kill the victim and conceal her remains. Thus, the evidence of a sudden confrontation on November 18 is too speculative to put the issue of intent sufficiently in dispute. The defendant otherwise has pointed to no evi-

dence of a lesser degree of homicide than that with which he was charged that would be sufficient to meet the standards articulated by *State* v. *Rasmussen,* supra.

## IV

The defendant claims that the trial court incorrectly allowed the state to introduce into evidence certain statements made by the victim tending to show the victim's belief that, if something should "happen" to her, it would not be the result of her own actions. He claims that the statements were inadmissible because they were hearsay, irrelevant and prejudicial. We find no reason to overturn the trial court's rulings.

Over the defendant's objections, the state presented the testimony of five witnesses who offered statements made by the victim during the fall of 1986. Diane Andersen, the victim's attorney handling the divorce proceeding, testified that the victim had told her that "if something should happen to her I should not assume that it was an accident." Lee Ficheroulle, a coworker and friend, testified that the victim had told her that "her husband would find her wherever she went . . . [and that] he would have an alibi and a well thought out plan"; Ficheroulle's husband testified to the same effect. Lena Johansson-Long, another coworker, testified that the victim had told her that "if anything ever happens to me, please don't accept it as an accident no matter what he says." Finally, coworker Rita Buonanno testified that the victim had told her that "if anything ever happened to me, if you ever hear that I've been in an accident or if I'm missing, don't believe it and do something about it."

Our review of claims of alleged error in evidentiary rulings is limited. The issue before us is whether the trial court's admission of this testimony was an abuse of its discretion. *State* v. *Sierra,* 213 Conn. 422, 434–35, 568 A.2d 448 (1990).

The defendant initially claims that these out-of-court statements were hearsay. An out-of-court statement is hearsay, however, only if it is offered to prove the truth of the matter asserted in the statement. A statement that is offered to establish circumstantially the state of mind of the declarant is not offered for the truth of the statement. C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.3.2. As the trial court correctly observed, because the state offered the evidence to establish only the victim's state of mind, the statements were not hearsay.

The defendant next claims that these statements were irrelevant. If offered merely as circumstantial evidence of the victim's state of mind, the defendant maintains that they should have been excluded because, in a murder prosecution, the relevant state of mind is that of the defendant and not that of the victim. *State* v. *Duntz,* 223 Conn. 207, 233, 613 A.2d 224 (1992).

Whether the victim's state of mind is relevant depends, however, on the nature of the issues at trial. A defendant's articulated or implied theory of defense may make the victim's state of mind material to the determination of the defendant's guilt or innocence.[8] In *State* v. *Blades,* 225 Conn. 609, 633, 626 A.2d 273 (1993), the defendant, invoking the defense of extreme emotional disturbance to a charge of murder; General Statutes § 53a-54a (a); asserted that his conduct resulted from provocation by the victim. Because the defendant had thereby made the victim's state of mind

---

[8] We recognize that courts in other jurisdictions have limited admission of evidence of a victim's state of mind to certain categories of murder cases. See, e.g., *State* v. *Langley,* 354 N.W.2d 389, 398–99 (Minn. 1984) (limiting category of murder cases to which victim's state of mind is relevant to those involving claims of suicide, accident or self-defense); *State* v. *Magruder,* 234 Mont. 492, 765 P.2d 716, 717–19 (1988) (same); but see *State* v. *Silveira,* 198 Conn. 454, 462, 503 A.2d 599 (1986) (noting distinction between affirmative defenses recognized by law, such as extreme emotional disturbance, and mere theories of defense, such as claim of innocence).

an issue in the case, we held that evidence was admissible to show whether it was likely that the victim had provoked the defendant.

In the present case, similarly, the victim's state of mind became relevant when the defendant questioned whether the victim was in fact dead, or was merely missing or in hiding. Although not overtly adopted as a "theory of defense" at trial and although disavowed on appeal, the defendant's assertion that he was not guilty because the "victim" had voluntarily left the country or had otherwise disappeared without leaving a trace appears repeatedly in the trial record.[9] Additionally, the defendant at trial challenged not only the state's assertion that the human fragments in evidence at trial proved that a person had died, but also its claim that the human fragments were those of an identifiable victim, his wife. This evidence of the victim's state of mind, therefore, was probative of whether she was likely to leave. From this evidence the jury could have concluded that, despite the victim's concern for her safety, she intended to remain with her family.[10]

[9] The defendant's testimony, presented in the first trial but properly admitted in the second, for example, indicated that the victim would occasionally leave for longer than usual trips without informing him. The defendant also told the police in an interview on December 4, 1986, that he thought that his wife had a friend in the Canary Islands, and that she might be there. The defendant cross-examined the victim's mother by inquiring whether "the purpose of [the victim's children being christened in Denmark was] that . . . the children would be entitled to Danish citizenship by virtue of their christening?" In addition, during the cross-examination of Susan Lausten, a neighbor, the defendant inquired whether the victim had made extended trips of up to one week in length, had had friends in several other countries, and had made at least one trip to Tokyo, Japan. A similar inquiry was directed at Pierre Ficheroulle, an acquaintance, regarding a conversation that he had had with the victim, encouraging her to leave the defendant and possibly to go into hiding.

[10] Contrary to the suggestion of the dissenting opinion, the victim's state of mind was admitted to show not her fear of the defendant, but her state of mind not to leave.

We conclude, accordingly, that our holding in *Blades* supports the trial court's rulings on the relevance of the victim's state of mind in this case. The trial court acted within its discretion in determining that the victim's statements would allow the jury to infer that the victim's absence was not voluntary and that this evidence was relevant in light of all the circumstances.

The defendant's final objection to the admission of the statements is that the testimony should have been excluded because it was more prejudicial than probative. The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. *State* v. *DeMatteo,* 186 Conn. 696, 702–703, 443 A.2d 915 (1982). The trial court, if called upon to rule on a question of prejudice, must determine whether the adverse impact of the challenged evidence outweighs its probative value. *State* v. *Greene,* 209 Conn. 458, 478, 551 A.2d 1231 (1988).

The defendant claims that the testimony regarding the five statements by the victim referring to the defendant was unduly prejudicial because the jury may have focused on the alleged accusatory aspect of the statements and, despite the court's curative instructions, may have impermissibly considered them as probative of the defendant's conduct rather than as evidentiary of the victim's state of mind. We recognize the risk of prejudice in allowing surrogates to speak for the victim "pointing back from the grave." See *State* v. *Duntz,* supra, 232–33; see also *Shepard* v. *United States,* 290 U.S. 96, 104, 54 S. Ct. 22, 78 L. Ed. 196 (1933).[11] We conclude, nonetheless, that the defendant has not established that the trial court, which care-

---

[11] Commenting on the victim's statement, "Dr. Shepard has poisoned me," Justice Cardozo opined in *Shepard* v. *United States,* 290 U.S. 96, 104, 54 S. Ct. 22, 78 L. Ed. 196 (1933), that "[i]t will not do to say that the jury might accept the declarations for any light that they cast upon the exis-

fully evaluated the statements, noted the absence of any direct accusations of the defendant and determined that in this case the statements were not unduly prejudicial, abused its discretion by admitting them into evidence.[12]

## V

The defendant's final claim is that the trial court was required to dismiss the charges against him because excessive pretrial publicity deprived him of the right to a fair trial. The record demonstrates that his arrest and all proceedings, including the entire first trial that ended in a mistrial, generated an unusually large amount of publicity both in and out of the state. To ameliorate the impact of this publicity, although the murder was alleged to have occurred within the judicial district of Danbury,[13] the defendant's retrial was moved to the judicial district of Stamford-Norwalk. The defendant moved for dismissal on the ground of prejudicial publicity prior to the second trial, and again at the conclusion of the trial. On appeal, the defendant reasserts his argument that this publicity was so pervasive that prejudice should be presumed because it was impossible to empanel any impartial jury to hear his case. In the alternative, he argues that at least some of the jurors were demonstrably prejudiced by the publicity. We disagree with both of these claims.

tence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds."

[12] We do not intend to suggest that the existence of a direct accusation is so inherently prejudicial as to be per se harmful. As in all determinations of evidentiary objections based on prejudice, the well established rule that the trial court must assess the probative value of the evidence in light of its potentially prejudicial effect also governs proffers even of a victim's direct accusations that are otherwise properly admissible.

[13] The defendant's first trial was held in the judicial district of New London.

To place our analysis of the defendant's claim regarding the extensive publicity in context, we must recognize the first amendment right of a free press to observe and publicize criminal trials. See *Globe Newspaper Co.* v. *Superior Court,* 457 U.S. 596, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982). It follows naturally that the public will hear and read reports of such proceedings. Dissemination of such information and the accompanying publicity itself, therefore, is not constitutionally objectionable. Extensive publicity implicates the defendant's due process rights[14] only if it rises to a level sufficient to preclude a fair trial for the accused.

The defendant claims that, in this case, the publicity concerning the proceedings against him was so pervasive that he could not empanel an impartial jury. Events across this country remind us of our judicial responsibility to assure that every person accused of criminal conduct receives a fair trial. See, e.g., *Lozano* v. *State,* 584 So. 2d 19 (Fla. App. 1991), review denied, 595 So. 2d 558 (Fla. 1992). Although it is the defendant's burden to show the existence of either inherently prejudicial publicity or actual jury prejudice, appellate tribunals have the duty to make an independent evaluation of the circumstances giving rise to such a claim. *State* v. *Pelletier,* 209 Conn. 564, 568, 552 A.2d 805 (1989); *State* v. *Miller,* 202 Conn. 463, 477, 522 A.2d 249 (1987); *State* v. *Piskorski,* 177 Conn. 677, 686, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

Even without a showing of actual jury prejudice, a conviction must be overturned "in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable." (Internal quotation marks omitted.) *State* v. *Piskorski,* supra, 686. A

---

[14] See footnote 3.

defendant cannot rely, however, on the mere fact of extensive pretrial news coverage to establish the existence of inherently prejudicial publicity. Prominence does not, in itself, prove prejudice. *State* v. *Pelletier, supra,* 570. The defendant must demonstrate that the publicity was so inflammatory or inaccurate that it created a trial atmosphere "utterly corrupted by press coverage." *Murphy* v. *Florida,* 421 U.S. 794, 798, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); see *State* v. *Townsend,* 211 Conn. 215, 226–27, 558 A.2d 669 (1989).

Evidence of the publicity of which the defendant complains in this case does not prove inherent prejudice. Most of the news coverage consisted of factual descriptions of information gathered by the police. In particular, virtually all stories highlighted the state's theory of the case—that the victim was intentionally killed and later her body was disposed of through a woodchipper—and the state's arrest of the defendant. The case was occasionally referred to in the press as the "woodchipper murder case." Following the first trial, the fact that the original jury allegedly deadlocked eleven to one for conviction was also widely reported, as was the state's attorney's expressed disappointment with the mistrial.[15]

Although the press at times drew dramatic conclusions on the basis of the information, and at times engaged in speculation, none of the coverage was so inflammatory as to prevent the empaneling of a jury dedicated to objectivity and to following the trial court's instructions. See *Beck* v. *Washington,* 369 U.S. 541,

[15] The defendant submitted copies of the various reports and stories in support of his motion to the trial court. Articles appeared in the New York Times, Boston Globe, Kansas City Star, People Magazine and at least one Danish newspaper, as well as the Danbury News Times, Newtown Bee, Bridgeport Post, Stamford Advocate, Norwalk Hour and Connecticut Magazine. Television coverage was reported on all the Connecticut stations, several New York stations, and, nationally, on the television program, "A Current Affair."

555–57, 82 S. Ct. 955, 8 L. Ed. 2d 98, reh. denied, 370 U.S. 965, 82 S. Ct. 1575, 8 L. Ed. 2d 834 (1962). Furthermore, the passage of an extended period of time from the defendant's arrest in January, 1987, to the first trial eighteen months later and finally to the second trial in 1989 attenuated the prejudicial effect that the publicity might otherwise have had. See *State* v. *Townsend,* supra, 227. Finally, the voir dire in this case reveals that, although many prospective jurors were familiar with the fact of the defendant's arrest and of his first trial, most had only a vague recollection of any particular accounts of the crime. See *State* v. *Pelletier,* supra, 571. We conclude, therefore, that the publicity in this case did not create a trial atmosphere so "utterly corrupted by press coverage"; id., 570; as to deny the defendant's due process right to an impartial jury.

In the alternative, the defendant maintains that his conviction should be set aside because of actual prejudice in the composition of the jury by which he was tried. This claim has two parts. The defendant first claims that he was forced to exhaust his peremptory challenges with respect to prejudiced members of the venire whom the court should have excused for cause and thus he was unable to exercise peremptory challenges with regard to some of the jurors who actually heard the case. His second claim is that the jurors who actually determined his guilt were largely predisposed in favor of the prosecution.

The defendant cannot prevail in his complaint concerning his peremptory challenges. The trial court has discretion to determine the competency of a juror to serve. General Statutes § 54-82f. On appeal, therefore, we may reverse the trial court's denial of a request to excuse a juror for cause only upon a showing of abuse of discretion resulting in prejudice to one of the parties. See *State* v. *Pelletier,* supra, 572–73. The defendant unsuccessfully challenged twelve venirepersons for

cause and used only eight of his twenty-five peremptory challenges to excuse these jurors, leaving four of the twelve for the jury. Our review of the voir dire indicates that the trial court acted well within its discretion by considering and denying each of the defendant's challenges.[16] *State* v. *Pelletier,* supra, 570–71.

We are equally persuaded that the defendant has not proved actual prejudice in his petit jury. We have reviewed the voir dire of the sixteen venirepersons who together comprised the jury and alternates, only four of whom the defendant had challenged for cause. In *State* v. *Pelletier,* supra, we observed that, subject to a full exploration of the "level and effects of each

---

[16] The trial court, in responding to the defendant's motion to dismiss following the second trial and conviction, summarized as follows: "The defendant claims that because the court did not automatically exclude for cause persons with 'a significant degree of familiarity' with the case . . . the method of jury selection was unfair because the defendant was forced to use peremptory challenges to exclude such persons from the jury, thereby limiting his ability to exercise those challenges for all of the traditional reasons that such challenges are available.

"As to the exercise of peremptory challenges, when the presumptive jury—the original twelve jurors—had been selected, the defense had exercised only 17 of its 25 peremptory challenges.

"When the third of the four alternate jurors had been selected, the defense had utilized only 20 of its 25 peremptory challenges. To exhaust its allotted peremptory challenges, the defense had to use five peremptory challenges to select the fourth and final alternate. Actually, six peremptory challenges, because the court granted an additional peremptory challenge to each of the parties, which the defense promptly exercised.

"Some of the presumptive jurors selected were not challenged for cause by the defense even though they expressed an initial opinion of the defendant's guilt or an assumption that Helle Crafts was dead or knew of the previous mistrial and the purported jury vote. . . . I point this out only to support my conclusion that the defendant was not forced to exercise his challenges in order to prevent jurors who had formed opinions about the guilt of the defendant based on widespread publicity and preconceived notions from becoming members of the jury, but rather intentionally was attempting to secure a jury that was acceptable to him from his point of view. A perfectly proper use of peremptory challenges. It is not, however, the court's duty to grant challenges for cause just to assist in the selection of a particular jury."

prospective juror's exposure to the publicity concerning the defendant . . . [q]ualified jurors need not . . . be totally ignorant of the facts and issues involved." (Citations omitted; internal quotation marks omitted.) Id., 570–71; *Murphy* v. *Florida,* supra, 799–800. Furthermore, we note that the trial court took unusually thorough measures to ensure the jury's continued impartiality through the use of extensive daily admonishments counseling the avoidance of any publicity. We, therefore, reject the defendant's claim that he was deprived of a fair trial because the jury manifested actual prejudice against him.

The judgment is affirmed.

In this opinion CALLAHAN, BORDEN and NORCOTT, Js., concurred.

BERDON, J., dissenting. Although this case raises several problematic issues, at the very least, I would reverse on the ground that the trial court abused its discretion by admitting into evidence the hearsay statements of the alleged victim, Helle Crafts. Helle Crafts' lawyer and friends were permitted to testify, over the defendant's objection, that Helle had stated that if anything happened to her they should not believe it was an accident and that the defendant would have a well planned alibi. The majority justifies the admission of these statements on the ground that they were not offered to prove the truth of the matter asserted, but merely to show Helle Crafts's state of mind. But how is her state of mind relevant in this case? The majority concludes that her state of mind is relevant to disprove the "theory" of the defendant's defense—that is, Helle Crafts is still alive.

To me, the victim's fear of the defendant, if relevant at all, would tend to support the opposite conclusion—

that she ran off out of fear.[1] The logic of the state's argument, that Helle's fear and apprehension show that she would not have left voluntarily, eludes me. How could one logically conclude that, because she feared the defendant and was apprehensive about him, she was dead.[2] In *State* v. *Duntz*, 223 Conn. 207, 613 A.2d 224

---

[1] The majority claims in footnote 10 that the trial court admitted Helle Crafts' statements for the limited purpose of demonstrating her state of mind not to leave and not for the purpose of showing that she was afraid of the defendant. The limiting instructions, however, never explained to the jury what the legalistic term "state of mind" means, nor did they expressly indicate that "state of mind" was limited to the fact that Helle Crafts would not have left the country voluntarily. The following are examples of the court's instructions: "I am allowing [Helle's statements] for a limited purpose only . . . so the jury will have available . . . what might be the state of mind of Mrs. Crafts as it existed on October 7th . . . ."; "I'm not allowing this testimony in . . . to establish that . . . [it] is true. What I am allowing it in for, is to establish the state of mind of Helle Crafts . . . ."; "[T]hat statement of Helle Crafts' can only be used to reflect her state of mind. Her opinion or her attitude. And it is not being offered for the purpose of proving the truth of the statement"; "[The statements are being admitted] merely for the purpose of establishing her state of mind, *what was going through her mind at the time she made the statement.*" (Emphasis added.)

Under these circumstances, it is only reasonable to believe that the jury inferred from this testimony that Helle Crafts was fearful of the defendant. Certainly, the jury would be perfectly reasonable in believing that fear was a central part of Helle's "opinion or her attitude" and "what was going through her mind at the time she made the statement." In fact, it is inconceivable that Helle Crafts would have made such statements if she were *not* afraid of the defendant. Given that fear is the necessary predicate to the existence of such statements, the majority's suggestion that the statements were admitted only to show Helle's "state of mind not to leave" and its belief that the jury was capable of extracting and disregarding the overwhelming element of fear from these statements is simply incredible. But even if the majority's argument is accepted at face value, the statements are not relevant to show that Helle would not have left the house voluntarily. As noted in my dissent, the statements, if relevant at all, would support the inference that she did leave voluntarily.

[2] The majority relies on *State* v. *Blades*, 225 Conn. 609, 635, 626 A.2d 273 (1993), but that case is inapposite. In *Blades*, the victim's fear of the defendant was relevant to the defense of extreme emotional disturbance to prove that it was unlikely that she was the aggressor. "The victim's fear of the defendant was relevant to challenge the defendant's version of the

(1992), dealing with the precise issue of whether the deceased's hearsay statements of fear may be admitted into evidence, we held the admission of such evidence to be reversible error. "[T]he victim's alleged fear of the defendant was not relevant, and therefore . . . the testimony was not admissible under the state of mind exception to the hearsay rule. Evidence is relevant only if it has some tendency 'to establish the existence of a material fact.' " Id., 233.

Furthermore, the claim that Helle Crafts was still alive was not the "theory of defense" in the defendant's second trial. The defendant did not testify at the second trial; rather, the state introduced the defendant's testimony from the first trial, thereby raising this issue. Similarly, defense counsel did not argue this theory to the jury in closing argument. The majority merely passes this off by stating that although it was "not overtly adopted," it was in the record. It was in the record, but only because the state put it there.

Finally, although the statements purportedly were admitted to show the victim's state of mind, ultimately the state used the victim's statement to prove the truth of a crucial element. The state referred to Helle Crafts' hearsay statements in its final argument, in conjunction with the issue of intent, as follows: "And so all these last words of Helle Crafts are with you to help determine whether or not in this particular case Richard Crafts possessed the conscious objective to cause a result, that is the death of Helle Crafts. Those are words we'll never forget."

Nevertheless, the prejudicial effect of these statements far outweighed any minuscule evidential value. These statements were dynamite. We recognized this in *State* v. *Duntz,* supra, when we stated that such hear-

facts by establishing that it was unlikely that the victim, having expressed a grave fear of the defendant in the past, would have behaved aggressively toward the defendant to a point where he felt threatened." Id.

say statements of subjective fear had "the tremendous potential . . . to prejudice the defendant unfairly." Id., 233. "[W]hile irrelevant evidence is never admissible, relevant evidence may be rejected if its probative value is outweighed by such factors as time, confusion, or prejudice." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.1.3, p. 227. Generally, the admission of such evidence is within the sound discretion of the trial court; *State* v. *Marquez,* 160 Conn. 47, 51–52, 273 A.2d 689 (1970); but, in cases such as this, we have found that the trial court has abused that discretion. *State* v. *Vennard,* 159 Conn. 385, 392, 270 A.2d 837 (1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971).

Nor can a limiting instruction from the court help in a case such as this. "To suggest that an instruction would neutralize the prejudicial impact is to defy reality. Not even appellate judges can be so naive as really to believe that all twelve jurors succeeded in performing what Judge L. Hand aptly called a mental gymnastic which is beyond, not only their powers, but anybody's else. *Nash* v. *United States,* 54 F.2d 1006, 1007 (2d Cir. 1932). *United States* v. *Bozza,* 365 F.2d 206, 215 (2d Cir. 1966)." (Internal quotation marks omitted.) *State* v. *Couture,* 194 Conn. 530, 563, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d (1985).

To admit into evidence these hearsay statements, which tend to prove the crime for which the defendant was charged, violates the defendant's constitutional rights "to be confronted by the witnesses against him" and to due process of law. Conn. Const., art. I, § 8; U.S. Const., amends. VI and XIV. The majority allows the jury to hear Helle Crafts' voice, notwithstanding the defendant's inability to confront or cross-examine her statements.

Accordingly, I respectfully dissent.