[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION FOR CHANGE OF VENUE
I.
PROCEDURAL BACKGROUND AND LEGAL PRINCIPLES
In the early morning hours of December 18, 1992, a Waterbury Police officer was shot to death while on routine patrol. Within hours, the defendant and a second suspect were arrested. The second suspect was charged with Hindering Prosecution, and the defendant with Capital Felony and Murder. The defendant's trial was scheduled to begin March 25, 1994.
By motion dated December 7, 1993, the defendant seeks a change in venue claiming such action is necessary to assure that the defendant's right to a fair trial is preserved. The State opposes said motion. A hearing was held on May 25th and 26th, during which the defendant entered a total of 26 exhibits into evidence, including five (5) television tapes, one (1) audio tape, and one hundred sixty (160) newspaper articles. The court has reviewed all exhibits entered into evidence, as well as the oral testimony offered at said hearing, and agrees with the position of the State that the defendant's motion should be denied without prejudice, pending the outcome of the voir dire proceedings.
The law is clear in this state that in requesting a change of venue, the defendant bears the burden of demonstrating that he could not otherwise receive a fair and impartial trial.State v. Townsend, 211 Conn. 215, 224 (1989). This is both for the convenience of the parties, and so that the community in which the crime took place can observe the criminal justice process first hand. This is not a consideration to be taken lightly, but is a consideration which must yield, where necessary, to the defendant's right to a fair trial. The court may exercise its discretion, in this regard, to the extent it is consistent with Practice Book Section 835(1), which provides: "Upon motion of the prosecuting authority or the defendant, or upon his own motion, the judicial authority may order that any pending criminal matter be transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending, or (2) If the defendant and the prosecuting authority agree." CT Page 5997
In this case, the defendant specifically claims inherent prejudice, in that the pretrial publicity in the Waterbury area makes the possibility of prejudice highly likely. "A defendant need not, however, show actual prejudice in extreme circumstances where there has been inherently prejudicial publicity such as to make the probability of prejudice highly likely or almost unavoidable." (Citations omitted, internal quotation marks omitted.) State v. Townsend, supra, 225.
To establish such an extreme circumstance, the pretrial publicity that was saturating the community would have to be so inflammatory or inaccurate in nature, or the result of such sensationalized accounts, that the subsequent trial would likely be conducted amidst a circus-like atmosphere utterly corrupted by the press and inconsistent with the ends of justice. SeeState v. Piskorski, 177 Conn. 677, 686-689 (1979); State v.Crafts, 226 Conn. 237, 258 (1993). Though massive publicity may be a factor with respect to the issue of inherent prejudice, is not, by itself, determinative, since prominence is not the equivalent of prejudice. State v. Piskorski, supra, 688. Furthermore, the passage of time may attenuate the prejudicial effect that pretrial publicity might otherwise have. State v.Crafts, supra, 259
With these principles in mind, the court reviewed the evidence submitted by the defense.
 II. ANALYSIS OF EVIDENCE PRESENTED
 A. ARTICLES FROM THE WATERBURY REPUBLICAN-AMERICAN
During the course of the hearing, the defendant submitted Exhibit (17) into evidence as the most significant source of the inherent prejudice claimed. This exhibit consists of one hundred fifty-eight (158) news items from the Republican-American, the major local paper in the Waterbury area.
As might be expected, banner front page headlines attended the first two (2) days reporting following Waterbury's first slaying of a police officer since the 1920's. A total of nineteen (19) articles covered every aspect of the event, CT Page 5998 including the police version of events (defendant bumping the victim to determine he wore a bullet proof vest, then shooting him in the head), defendant's alleged possession of drugs at the time as motive for the slaying, the arrests and criminal backgrounds of the suspects, fears and anger of residents, the victim and his family (pregnant wife and two (2) small children), the sorrow and support for victim's family, and the state's intention to pursue the death penalty.
Noticeable, even at the emotional peak of this episode, is the fact that the reporting relative to the police version, arrests and background of suspects, etc., was straightforward, factual, and, aside from the headlines themselves, neither inflammatory nor sensationalized. Even aggravating circumstances were simply reported and not overemphasized or unduly highlighted. As pertains to the above stated subject matter, this form of straight reporting was the rule rather than the exception throughout the pretrial period, including all court appearances of the suspects and related matters.
More prejudicial, however, were emotional accounts regarding the victim and his family and a front page headline carrying the State's vow to seek the death penalty, with an accompanying article citing the State's comments about the case (Exhibit 17, Item 9).
December 22, the funeral brought further front page banner headlines. Much was said in tribute and sorrow for the officer. Interestingly, at the same time, a straight, factual account of the defendant's charge being upgraded to Capital Murder was relegated to the (B) section of the paper. The first fifteen (15) days following the officer's death constituted the most intense and prominent coverage. Though articles continued throughout the month of December in tribute and mourning, they occupied varying degrees of front section prominence and rarely were of the banner headline variety, with the exception of the birth of the victim's child on December 30th.
It should be noted that also in December, several letters to the editor were published. These letters were among the total 20-25 such letters published during the pretrial period. As with all such letters, they were passionate in content and arguably prejudicial in varying degrees. The fact is, however, they reflected only the personal views of the individuals themselves, were not prominently displayed, and add little force CT Page 5999 to the argument for inherent prejudice. In fact, one might argue the reverse, given the relatively small number over such an extended period of time.
January brought several isolated instances of prejudice; a front page (lower right corner) article regarding the state seeking the death penalty with continued straight reporting of the facts of the case, arrest history of the suspects and prosecutor's comments about the strength of its case, etc. (Exhibit 17, Item 70); and an article (Section A, page 10) reporting on investigation of a robbery-shooting incident in which the defendant was identified as the shooter. January also saw defendant's first court appearance since his arraignment, about which was reported that security was tight but not necessary as few were present.
February 5th marked the first substantial hearing (hearing in probable cause) regarding defendant's case. The reporting was, again, straightforward and not inflammatory. The article was relegated to the (B) section, page (3) and the hearing was attended only by family and friends; and this, less than (2) months after the officer's death. The straight reporting, lack of prominent display, and relative lack of attendance, could be said of virtually all defendant's court appearances. The same could be said regarding the second suspect's court appearances and trial, with the exception of the verdict, not guilty, which garnered front page headlines, hardly prejudicial to the defendant (Exhibit 17, Item 122).
On the other hand, articles continued to be published regarding tributes, benefits, the trials and tribulations of the family, calls for stiffer penalties, the death penalty, etc., but, far more scattered than before, brief, and rarely prominently displayed.
On March 10th, the defendant again was on the front page (lower, right corner) with the headline "Accused Killer Found Stabbed in Cell," (Exhibit 17, Item 100), but even this appearance was far overshadowed by the Rodney King case and the banner headline "We're Going to Kill You" (alleged police comments to King). In the accompanying article, King describes the fear and pain associated with his beating at the hands of the police.
The anniversary of the officer's death and Mother's Day are CT Page 6000 dates which brought further prominent articles with themes of sad remembrance, anger and support for the death penalty. Even at such times of heightened emotion, reporting about the case itself remained straightforward, and was given no particular prominence.
Certainly, many other items are worthy of note in terms of support or opposition to defendant's claim of inherent prejudice; but, further analysis, at this point, would simply be repetitious and unnecessary.
In short, reporting that might be termed extensive and intense was limited, for the most part, to the first month or so following the homicide. This period included many of the items of an emotional nature that were not only prejudicial or arguably inflammatory, but also prominently displayed.
As for publicity concerning the state's case, the suspects, court appearances, etc., the reporting was almost entirely straightforward with no intent to inflame, mislead, or sensationalize; and the articles themselves were given no particular prominence, generally.
Articles regarding the impact of the homicide on the family and friends of the victim, community reaction, tributes, memorials, benefits, etc., constitute the most prejudicial material and an area of concern for the court.
Less prominently displayed, but, significant, at least, in terms of number are the articles concerning the death penalty and its supporters; another area of concern for the court.
 B. OTHER FORMS OF MEDIA COVERAGE
This case was also covered by a number of television stations, including channels 3, 8, 30, 61, providing local and statewide coverage; and a limited access station, channel 13, used by area residents.
Statewide coverage was intense on the dates of the incident, arrests, and the funeral, and basically consisted of brief bits of coverage with some emphasis on aggravating circumstances and prejudicial comments by individual citizens CT Page 6001 and officers. Generally, however, the reporting was straightforward, factual and not extensive, and therefore, not a significant factor for the court's consideration, nor was it claimed as such by the defendant.
Channel 13, the local access station carried an interview with members of the victim's family, and coverage of a meeting of residents and officials in support of the death penalty. Though certainly prejudicial to the defendant, the elements of limited access and a virtually unidentifiable audience render this evidence, also, of little significance.
In the same vein is the coverage by the Waterbury Observer, a local paper, free to the public. This coverage consists of one front page full-size picture of members of the victim's family and an accompanying article, "Fighting Back;" and an article about a prominent politician in which reference is made to his support of the victim's family and their campaign for the death penalty. Given, again, the element of an unidentifiable audience and the limited coverage, this evidence is not a significant factor in the court's assessment.
 C. SURVEY RESULTS
At the hearing, the defendant offered into evidence the testimony of Donald Perry as an expert in the field of surveys and poll-taking, and Exhibits 1 and 2 which basically consisted of a telephone survey taken with respect to this matter, the results and analysis of the results. The defendant argues that the survey results are the strongest evidence of inherent prejudice, and are attributable to publicity generated by the Republican-American.
The court is satisfied as to the expertise of Dr. Ferry; that he followed accepted procedures for these types of surveys; that, based on his testimony, 300 persons is an adequate sample from Waterbury, and that the margin of error is not greater than 6.5%. The court is further satisfied that the 300 persons reside or straddle the Waterbury district boundaries, and most of them would qualify as potential jurors.
The court's problem with the survey basically concerns the nature of the survey itself. "Out of the blue" phone calls to CT Page 6002 virtually unknown persons residing in a given area might well be suited to a quick "head count" or quick "read" relative to some established preference such as for a political candidate or a soft drink (as argued by the State); but, as to more thought provoking issues, such as: individual prejudgment as to the guilt or innocence of the defendant, community prejudgment as to the guilt or innocence of the defendant, perceptions as to the possibility or degree of possibility that the defendant could receive a fair trial in the Waterbury area, degree of attention paid to articles about the case, etc., such a survey leaves much to be desired. The court does, however, consider the survey a legitimate indicator of the "awareness" factor, and set preferences relative as to the death penalty.
The key concern for the court's consideration in this case is whether or not there is a sufficient pool of Waterbury area residents who are able to set aside whatever awareness or feelings about the case, or emotions regarding the family they may have; accord this defendant the presumption of innocence, and judge this case only on the evidence they hear or see in the courtroom. The survey is of little value in this regard.
The atmosphere of the survey does not lend itself to thought provoking analysis and response. It is as superficial a method of dealing with complicated issues as can be imagined, and the necessarily vague categories of responses provide little helpful information relative to the more difficult issues.
On the other hand, as previously indicated, the court accepts the survey as a legitimate indicator of a high degree of awareness in the Waterbury area with respect to this case; 16% very familiar, 14% somewhat familiar, and 34% only a little familiar (Exhibit 1, pg. 8). The results are vague, but it is safe to conclude that a substantial amount of awareness does exist; though that awareness does not appear to extend to details.
Furthermore, the court would accept the survey as an indicator that a high percentage of Waterbury area residents would favor the death penalty in situations involving a murdered police officer. This appears to be the case in the other two areas surveyed as well, though to a somewhat lesser extent. In any event, this is not an indication that such residents could not follow the law pertaining to a death penalty hearing. CT Page 6003
The fact that there is substantially less awareness of this matter in other areas of the state is not at all surprising and is not probative of the main issue before the court; that is, whether the defendant has satisfied the burden of demonstrating that he could not, in all likelihood, receive a fair trial in Waterbury.
 III. CONCLUSION
This court is satisfied that the defendant can receive a fair trial in the Waterbury area, and that the defendant has failed to sustain its burden of proof. Areas of concern such as pretrial publicity generated in support of the victim's family, and in support of the death penalty, can be effectively dealt with through our voir dire procedure. Proper use of Connecticut's individual voir dire should be sufficient to assure the defendant of a fair and impartial jury.
The individual voir dire will also provide the court with an opportunity to test its own conclusions; and, if not satisfied, to ultimately grant the defendant an appropriate change of venue.
Accordingly, the defendant's motion for change of venue is denied without prejudice.
FASANO, J.