******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* PHILIP FRIEND
(AC 36097)

DiPentima, C. J., and Alvord and Pellegrino, Js.

*Argued March 4—officially released August 18, 2015*

(Appeal from Superior Court, judicial district of New Haven, B. Fischer, J.)

*Paul F. Enzinna*, pro hac vice, with whom was *Dylan P. Kletter*, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Brian K. Sibley, Sr.*, and *Maxine Wilensky*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Philip Friend, appeals from the judgment of conviction, rendered after a jury trial, of twelve counts of larceny of varying degrees: three counts of larceny in the first degree in violation of General Statutes (Rev. to 2007) § 53a-122 (a) (2), two counts of larceny in the second degree in violation of General Statutes (Rev. to 2007) § 53a-123 (a) (2), and seven counts of larceny in the third degree in violation of General Statutes (Rev. to 2007) § 53a-124 (a) (2).[1] These charges arose out of his relationship with Standard Beef Company (SBC) between August, 2007 and February, 2008. On appeal, the defendant claims that: (1) the evidence was insufficient to support his conviction of larceny on all counts; (2) he was deprived of a fair trial by the prosecutor's statements made during the state's closing argument; and (3) he was denied his constitutional right to a speedy trial when the state "failed to bring him to trial until four and a half years after his arrest . . . ." We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On August 2, 2007, the defendant signed an agreement to become a consultant to SBC in New Haven. SBC was owned solely by Henry Bawarsky and was in the business of purchasing meat products from wholesale suppliers and then reselling them to its customers. Under the terms of the agreement, the "specific services" that were to be provided by the defendant to SBC would have to be mutually agreed on by the parties. The defendant would provide his services to SBC as an independent contractor and would be ineligible to receive "any additional compensation or employee benefits that would otherwise accrue to him if he were an employee . . . ." The agreement further provided that the defendant would be reimbursed for his documented out-of-pocket expenses. In consideration for his services, the defendant would receive 25 percent of SBC's net profits estimated weekly.[2] In addition, the defendant was to "receive an option to purchase, together with Richard Greenfield, all of the outstanding shares" of SBC to be exercised by December 31, 2007.[3] The agreement specifically provided that "[a]ll moneys to be paid by [SBC] to third parties" had to be approved in writing by Bawarsky and either the defendant or Greenfield, which could be evidenced by "a check signed by both such parties."[4] Finally, the agreement provided that its terms "may not be altered, modified or extended except in writing signed by both parties."

Prior to the defendant's becoming a consultant to SBC, the company employed approximately twenty people. It was managed primarily by Bawarsky, senior vice president William Dober, and senior accountant/comptroller Fred Auger. Paper documents were created

to keep track of the inventory and finances.[5] The blank company checks were stored in a safe. Only employees in a position of trust had the combination to access the safe.[6] Prior to any checks being sent out, Auger would match the printed checks with the corresponding invoices and submit them to Dober for verification and signature. Likewise, Dober, who had a corporate credit card, provided Auger with itemized receipts to explain and justify the charges on the account. Although Auger could issue checks, he was not authorized to sign them. Overall, Bawarsky, Dober, and Auger actively were engaged in the running of SBC and remained informed of its day-to-day operations and financial situation.

In August, 2007, SBC was in a poor financial situation; it did not have enough funds to pay its suppliers on time and frequently risked overdrafting its bank account. Nevertheless, SBC remained an attractive acquisition target because it owned approximately a 15 percent stake in New Haven Food Terminal—a real estate asset worth "millions of dollars."

Once the defendant had assumed his role as a consultant to SBC in August, 2007, he immediately began implementing changes in the way the company had been operating. The old computer software was enhanced by a modern one, providing more timely and accurate information to the sales personnel.[7] The data from the new system, which became fully operational in October, 2007, fed directly into Greenfield's office in New York, so he could remotely monitor and access SBC accounts. In addition to the new software, Greenfield provided SBC with barcode scanners and label printers to improve efficiency. Greenfield also provided SBC with an $800,000 line of guaranteed trade credit to help ease the company's financial burden.[8] As a result of these changes, SBC's finances significantly improved; the frequency and amounts of the bank account overdrafts diminished, profit margins improved, and the annual loss of $400,000 began to decrease.

At the time of these changes, Bawarsky was seen with the defendant and introduced him to the company's personnel as someone who would help turn the business around and become the eventual owner of SBC. On August 6, 2007, Bawarsky, who was seventy-nine years old, suffered a broken leg, was hospitalized for more than a month and was unable to participate in the running of SBC. Even after he was able to return to work, Bawarsky would come in only for several hours three or four times a week.

Following Bawarsky's injury, the defendant increased his role in the day-to-day operations of SBC. On September 24, 2007, he fired Auger and assumed the company's accountant/comptroller duties, becoming an employee in addition to his consultant position. Having assumed Auger's position, the defendant gained control over the SBC checkbook, and Dober no longer had

control over some checks that were being sent out.

On November 27, 2007, the parties signed an amendment to the original agreement extending the option to purchase SBC to February 28, 2008. Despite the extension, the sale of SBC did not occur. In February, 2008, David Bawarsky, Henry Bawarsky's son, took control of the company and forced the defendant out, removing him from the property with the help of the New Haven police.

A criminal investigation ensued, and the defendant was charged with thirteen counts of larceny.[9] The jury found the defendant guilty on twelve counts, and the court sentenced him to twelve years incarceration, execution suspended after six years, with five years probation. This appeal followed. Additional facts will be set forth as needed.

I

SUFFICIENCY OF EVIDENCE

We begin with the defendant's challenge to the sufficiency of the evidence to support his larceny conviction on twelve counts. "A defendant who asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 146 Conn. App. 99, 110, 75 A.3d 798, cert. denied, 310 Conn. 948, 80 A.3d 906 (2013). "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw

whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[In addition], [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Papandrea*, 302 Conn. 340, 348–49, 26 A.3d 75 (2011).

As to the law governing the crime of larceny in Connecticut, "[a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."[10] General Statutes § 53a-119. Our "courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Flowers*, 69 Conn. App. 57, 69, 797 A.2d 1122, cert. denied, 260 Conn. 929, 798 A.2d 972 (2002). "Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. . . . One who takes property in good faith, under fair color of claim or title, honestly believing that . . . he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in such case the felonious intent is lacking. . . . The general rule applies . . . to one who takes it with the honest belief that he has the right to do so under a contract . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Papandrea*, supra, 302 Conn. 350. With these principles in mind, construing the evidence in the light most favorable to sustaining the verdict, we determine that the jury reasonably could have concluded that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt as to each conviction.

A

The defendant first claims that there was insufficient evidence to support his conviction of three counts of larceny in the first degree in violation of § 53a-122 (a) (2).[11] We address each in turn.

1

Count One–Webster Bank Debt

The following additional facts are relevant to this claim. Prior to becoming a consultant to SBC, the defendant was the principal of Ridgefield Farms, LLC (Ridgefield Farms), a wholesale beef seller that had been a supplier to SBC. Ridgefield Farms had an outstanding debt to Webster Bank in the amount of $88,158.66. The defendant was personally responsible for settling the debt by November 16, 2007.[12] On November 9, 14, and 16, 2007, the defendant handwrote three SBC checks payable to "Webster" adding up to the amount of the outstanding debt.[13] Checks dated November 9 and November 16 were signed by the defendant only. The November 14 check had two signatures; the defendant's and a signature resembling Dober's. Dober testified, however, that the second signature was not his.

At trial, the defendant argued that SBC owed Ridgefield Farms "[a] significant amount of money" for past deliveries of beef. To support his argument, the defendant introduced two internal SBC documents. The first document reflected that, as of May, 2007, SBC owed Ridgefield Farms $26,830.32. Dober testified that he recalled the debt being at "$27,000 and change" in the summer of 2007. The second document reflected an outstanding debt as $50,339.49 in July, 2007. In addition, the defendant presented the testimony of Attorney David Pite, who represented the defendant in his negotiations with Webster Bank regarding the settlement of the outstanding loan. Pite testified that in the fall of 2007, SBC owed Ridgefield Farms "in excess of $100,000." Pite explained that he knew the extent of the debt because, at that time, he also was representing SBC in two legal matters concerning the company's outstanding debts and, therefore, he "had to know who was owed what."

On appeal, the defendant claims that the state "offered no evidence that [SBC] did not authorize these checks, but instead asked the jury to infer the absence of consent because [SBC] had no connection with Webster Bank, and [the defendant] used the [SBC] money to pay off a debt he personally guaranteed." (Internal quotation marks omitted.) Such inference, the defendant contends, "is not supported by the evidence." Additionally, the defendant argues that the state failed to offer sufficient evidence to show that he had the intent to deprive SBC of its property. Specifically, the defendant argues that he acted under a good faith belief that SBC owed a substantial amount of money to Ridgefield Farms and that he, as the owner of Ridgefield Farms, was entitled to satisfy his personal debt to Webster Bank using SBC funds. We are not persuaded.

We first note that "direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quota-

tion marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 657, 1 A.3d 1051 (2010).

We further note that in *State* v. *Papandrea*, supra, 302 Conn. 340, our Supreme Court has considered the question of whether the defendant's intent to steal could reasonably have been inferred under a set of circumstances similar to this case. The similarities between the cases warrant a brief discussion of the *Papandrea* decision.

The defendant in *Papandrea* worked as an accountant and chief financial officer for Homecare Management Strategies, Inc. (Homecare), a provider of financial services to home health care agencies. Id., 342. At the same time, the defendant was a majority shareholder of White Oak Systems, LLC (White Oak), a software company that provided its services to Homecare. Id.

In a period from February, 2004 to February, 2005, the defendant issued a number of Homecare company checks payable to various art dealers. Id., 344. Once these transactions were revealed to the Homecare owner, the defendant's employment was terminated, and he was subsequently charged with stealing corporate funds to purchase artwork for his personal use. Id., 344–46.

At trial, the defendant argued that he was entitled to use the funds because "Homecare owed him money as White Oak's principal shareholder at the time he had issued the checks." (Internal quotation marks omitted.) Id., 345. Despite this defense theory, the jury convicted the defendant of nine counts of larceny in the first degree, and this court affirmed the judgment on direct appeal. Id., 345–46. Thereafter, our Supreme Court granted the defendant's petition for certification limited to the issue of the sufficiency of evidence in the case. Id., 342.

Affirming this court's decision, our Supreme Court concluded that the state had presented sufficient evidence to sustain the defendant's conviction. Specifically, the court held that the jury reasonably could have found that the defendant acted with intent to steal because (1) by virtue of his professional education and work experience he "knew that a debt to White Oak was different from a debt to him personally"; id., 351; (2) he transferred the "funds directly into his own pocket, rather than, for instance, transferring them to White Oak or sharing them with" another principal at White Oak; id., 353; (3) the relevant "entries in the Homecare check register contain nothing to indicate that the transactions involved artwork, that the payees were art dealers, or that the ultimate beneficiary of each transaction was the defendant or, for that matter, White Oak"; id., 356; (4) the defendant did not begin "making illicit withdrawals" until he had become "the sole Homecare

employee dealing on a daily basis with checks and book-keeping" and the provision of the financial reports to management; id., 355; and (5) Homecare had no prior history of issuing company checks "to an individual for personal use . . . ." Id., 354.

Likewise in the present case, the jury heard sufficient evidence reasonably to conclude that the defendant acted with a specific intent to deprive SBC of property. At trial, the jury heard evidence that the defendant's initial role at SBC was that of "an advisor and consultant." In addition, having terminated Auger in September, 2007, the defendant became the company's accountant/comptroller, assuming oversight and control of SBC's finances. On the basis of this evidence, the jury reasonably could have concluded that the defendant, as an executive officer of the company, must have known that SBC's debt to Ridgefield Farms was distinct from a debt to him personally. Having reached that conclusion, the jury then reasonably could have inferred that the defendant was not acting under the good faith belief that SBC owed the funds to him personally.

Additionally, the jury could have concluded that, at the time he wrote out the checks, the defendant was not acting in good faith because he did not follow the required SBC procedure of having two signatures on the company's checks, he handwrote the checks instead of issuing them on the company's newly installed computer software, he simply named Webster Bank as the payee without any explanation of the underlying nature of the transaction, and he transferred funds directly to Webster Bank instead of paying Ridgefield Farms first and then paying off the debt.[14] Moreover, the jury reasonably could have concluded that SBC's debt to Ridgefield Farms was not large enough to explain the payment of $88,158.66. While it is true that Pite testified that SBC's debt to Ridgefield Farms was in excess of $100,000, the jury also heard Dober testify that he remembered the debt being approximately $27,000. It is axiomatic that the jury, as the final arbiter of credibility of any witness, was free to disbelieve Pite and instead credit Dober's recollection of the amount of the debt and, thus, conclude that SBC did not owe Ridgefield Farms the amount claimed by the defendant.[15] See *State v. Robinson*, 125 Conn. App. 484, 489, 8 A.3d 1120 (2010) ("[o]n appeal, we cannot revisit the jury's decision to believe the witnesses"), cert. denied, 300 Conn. 911, 12 A.3d 1006 (2011). Moreover, because no evidence at trial established that SBC owed Ridgefield Farms any funds at the time the payments had been made, the jury was free to conclude that SBC did not owe any money to Ridgefield Farms.

Likewise, the jury reasonably could have concluded that the defendant had not been authorized to issue checks to Webster Bank by SBC or its owner Bawarsky,

and that he was aware of that. The consulting agreement, which the defendant personally had signed, expressly provided that all funds paid to third parties required a prior written authorization by Bawarsky and either the defendant or Greenfield. In addition, the company's check signing procedure was amended in August, 2007, explicitly to require two signatures on all SBC checks. The defendant had signed that document too, acknowledging his familiarity with the new policy.

Furthermore, the jury reasonably could have concluded that the checks themselves indicated lack of consent by SBC; two of the three checks bore only the defendant's signature, and the jury could have credited Dober's testimony that the third check, while bearing a second signature similar to his, in fact had not been signed by him. Significantly, the defendant did not issue the checks until after he had assumed control of the company's checkbook having terminated Auger. Finally, the jury reasonably could have concluded that the defendant lacked authorization and was trying to avoid detection by handwriting the checks used in the old computer system instead of issuing checks on the new system, which could be accessed and monitored remotely by Greenfield—the man who personally had extended and guaranteed the $800,000 trade credit to SBC.[16]

2

### Count Three–Berger Legal, LLC

The following additional facts are relevant to this claim. During the negotiations of the consulting agreement and its amendment, the defendant was represented by Attorney Jennifer Rose of Berger Legal, LLC (Berger Legal). In turn, SBC was represented by its own counsel, Attorney Geoffrey Hecht. Subsequently, Berger Legal sent the defendant three separate invoices for its services on August 31, 2007, for $8170.22; September 30, 2007, for $809.10; and October 31, 2007, for $1193.50. The defendant paid the invoices in full with three separate SBC checks issued using the old computer system. Each check appeared to have been signed by the defendant and Dober. At trial, however, Dober testified that the signature on the check for $1193.50 was not his and that he was not able to confirm that the signature on the check for $8170.22 was his.[17]

On appeal, the defendant claims that the state "offered no evidence from which the jury could infer that [SBC's] payment of [Berger Legal's] fees was unauthorized." We disagree.

In his brief, the defendant concedes that there was evidence at trial establishing Berger Legal as a third party. Under the terms of the consulting agreement, all SBC payments to third parties required written approval of both Bawarsky and the defendant or Greenfield. The checks to Berger Legal did not have Bawarsky's signa-

ture on them. Thus, the jury reasonably could have inferred that the lack of Bawarsky's signature indicated that such payments had not been authorized. In addition, the jury could have found that the defendant had chosen to issue the checks on the old system to avoid detection by Greenfield, who testified that he did not expect the defendant to pay any personal expenses with SBC funds. As in the first count, the defendant did not issue these SBC checks until after he had assumed the control over the SBC checkbook. Furthermore, the jury also could have inferred that the payments to Berger Legal had not been authorized on the basis of Dober's inability to confirm the authenticity of his signature on two of the checks. Finally, the jury, relying on its common sense, could reasonably have inferred that an agreement as to legal fees necessarily would have been reflected in the consulting agreement. See *State* v. *Lavigne*, 121 Conn. App. 190, 196, 995 A.2d 94 (2010) ("[triers of fact] are not required to leave common sense at the courtroom door" [internal quotation marks omitted]), aff'd, 307 Conn. 592, 57 A.3d 332 (2012). This inference is supported by the trial testimony regarding Bawarsky's involvement in the drafting of the agreement, the specific provision concerning the third party payments, and SBC's acute shortage of available funds.

### 3

### Count Four–Peaceable Sales, LLC

The following additional facts are relevant to this claim. On April 7, 2006, the defendant and his wife registered a limited liability company–Peaceable Sales, LLC (Peaceable Sales)–with the State of Connecticut. During his tenure at SBC, the defendant issued ten SBC checks to Peaceable Sales totaling $76,159.95. Although most of the checks were accompanied by a Peaceable Sales invoice, three checks had no corresponding invoices. Five of the checks were issued on the old computer system, and three were handwritten. Four of the checks had been signed by the defendant alone, and five more had a second signature that resembled Dober's. Dober, however, testified that four out of the five checks that had two signatures had not been signed by him.[18] Similarly, Dober's sister, Marcy Gollinger, also was unable to identify her brother's signature on all five checks.

At trial, Dober testified that he had no recollection of SBC doing business with Peaceable Sales, and that he had never seen an invoice from that company. In addition, Gollinger testified that she did not remember writing an SBC check to Peaceable Sales prior to August, 2007. Likewise, Ilka Cintron testified that she had not heard of Peaceable Sales prior to the defendant's arrival at SBC.

To counter the testimony and evidence presented by the state, the defendant introduced several documents

that, according to him, proved that the checks had been issued to satisfy SBC's outstanding debt to Peaceable Sales for real deliveries of meat products. Specifically, the defendant presented the jury with a series of invoices reflecting a purchase of thirty-seven boxes of tenderloins by SBC from Peaceable Sales that later purportedly were sold to West Conn meat company netting SBC a profit of $6770.62.

On appeal, the defendant argues that the state "produced not a shred of evidence to support its theory that any transaction between [SBC] and Peaceable Sales was a sham . . . ." On the contrary, the defendant argues, the evidence presented at trial "showed that [SBC] bought real beef from Peaceable Sales, which it later sold for a profit." We are not persuaded by these arguments.

As we have stated previously, the jury heard testimony that a total of ten SBC checks had been issued to Peaceable Sales. The first four checks, totaling $1855.26, were issued in September, 2007, using the old computer system. The following two checks, totaling $25,263.05, were issued in October and early November, 2007, using the new computer system. Thereafter, however, in November, 2007, and early January, 2008, the defendant handwrote two old system checks totaling $23,250.65. Later in January, 2008, the defendant issued a check for $10,432.91 using the new computer system again, followed by another handwritten check for $15,358.08 used in the old system.

At trial, Gollinger testified that by October, 2007, the new computer system was fully operational. She further testified that, once the new system had been installed, all of the existing accounts were transferred to the new system and SBC "started payables on [the] new system." The only exceptions, according to Gollinger, were the invoices and bills issued prior to October, 2007.

On the basis of her testimony, the jury reasonably could have concluded that this pattern of the alternating use of the old and the new computer systems well after the October changeover was an indication that at least some of the purported transactions between SBC and Peaceable Sales were fictitious, and that the defendant used the old system in November, 2007, and January, 2008, in an apparent attempt to hide the true nature of those payments. The jury could have found further support for its conclusion in the fact that the November and January checks issued under the old system had been handwritten and had only the defendant's signature. Moreover, the jury could have credited the testimony of Dober and Gollinger, neither of whom were able to verify the authenticity of Dober's signature on the checks at issue, and reasonably have concluded that the checks had been issued without following the procedure required by the consulting agreement and the SBC policy requiring two signatures.

In his brief, the defendant argues that the evidence at trial "showed that [SBC] made a profit on the items it purchased from Peaceable Sales." We note that the evidence the defendant cites to may explain one transaction, but not all. Furthermore, even if the jury were to credit every transaction between SBC and Peaceable Sales that had an accompanying invoice as legitimate, it, nevertheless, would have been left with two unexplained checks, permitting the jury reasonably to conclude that they were illegitimate because they were written by hand in January, 2008, and signed by the defendant alone. We further note that the combined value of these two checks equals $25,465.72, which exceeds the $10,000 threshold of § 53a-122 (a) (2).[19]

The defendant further contends that the state's arguments at trial, that Peaceable Sales was a "phony" company "run out of [the defendant's] house, supposedly by [his] wife, and that its bills to [SBC] were not legitimate bills," were not supported by the evidence and could have caused "the jury to speculate, or even suspect, that the company engaged in sham transactions." We are not persuaded by this argument.

It is well settled that because jurors are "well equipped to analyze the evidence," our appellate courts will not negate a verdict "on the chance . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." (Internal quotation marks omitted.) *State* v. *Chapman*, 229 Conn. 529, 539–40, 643 A.2d 1213 (1994) (en banc). Having reviewed the record, we conclude that in this case, as in *Chapman*, the jurors "were in a position to be able to evaluate the testimony presented and to assess whether the charged theory was supported by the evidence." Id., 540.

B

The defendant next claims that there was insufficient evidence to support his conviction of two counts of larceny in the second degree in violation of § 53a-123 (a) (2).[20] We address each in turn.

1

Count Five–Washington Mutual Credit Card

Additional facts pertaining to this count are as follows. During his tenure at SBC, the defendant had a personal credit card issued by the Washington Mutual Bank. From September, 2007, through January, 2008, the defendant made multiple purchases with the card, which, by the end of December, 2007, amounted to $7966.24. The credit card statements, introduced by the state at trial, reflected that, inter alia, the defendant made purchases at 121 Restaurant in North Salem, New York ($161.19); Vista Wine & Spirits in South Salem, New York ($68.80); Bed Bath & Beyond in Danbury

($231.97); Studentcity.com ($1497); Galleria D'Arte in Ridgefield ($330.94); Circuit City in Danbury ($58.29); Urban Outfitters in New Haven ($398.64); Ridgefield Pet, Inc. ($5.29); and Johnston & Murphy's in Marlton, New Jersey ($1003.50). The defendant also used the card to take out a cash advance of $1567.99, and incurred both a finance/cash advance charge of $47.04 and late fees in the amount of $78, all included in the total outstanding amount by the end of December, 2007.

On December 17, 2007, the defendant wrote an old-system check payable to the order of "Washington Mutual" in the amount of $5500. The check was hand-written and signed only by the defendant.

On appeal, the defendant argues that, in order to find him guilty on this count, the jury had to "make two separate and necessary" inferences: (1) the jury had to infer that SBC "did not authorize payment of charges that were not [SBC's] business expenses"; and (2) the jury had "to infer, from the descriptions of the charges contained in the billing statements, that charges paid with [SBC] funds were, in fact, [the defendant's] personal expenses, rather than [SBC's] business expenses." Neither of these inferences, according to the defendant, is supported by the evidence. We disagree.

To support his first argument, the defendant points to paragraph six of the consulting agreement, which provides that the "[c]onsultant shall be reimbursed for out-of-pocket travel and room, board and entertainment expenses incurred during the term hereof; provided [c]onsultant submits documentation verifying said expenses."

Although it is true that the consulting agreement does not specifically limit the reimbursement to business expenses only, the jury reasonably could have inferred that, as a consultant who was hired to bring in new business and help turn around the company in the midst of a deep financial crisis, the defendant would be reimbursed for only verified legitimate business expenses. Furthermore, an additional indication that SBC intended to reimburse the defendant for legitimate business expenses is found in paragraph one of the consulting agreement, which provides, inter alia, that the "[c]onsultant shall serve as advisor and consultant to [SBC] in connection with [SBC's] *business* activities." (Emphasis added.) Thus, the jury reasonably could have concluded that the defendant was hired to improve SBC's business fortunes and that he would have been reimbursed only for expenses incurred in the pursuit of that goal.

The defendant next argues that, "even if the jury could infer lack of authorization from the fact that a charge was not for a business expense of [SBC], the evidence was insufficient to permit the jury to infer that any charge paid with [the check] was not, in fact, a

business expense of [SBC]." Specifically, the defendant argues that the state "put on no evidence to show what was purchased in any credit card transaction, or even any evidence with regard to what was sold at any of the merchants involved."

The problem with the defendant's argument is that it presumes that the jury reasonably could have found that the expenses were personal only through direct evidence. His argument, however, ignores the substantial circumstantial evidence before the jury at trial. In particular, the jury reasonably could have inferred that the expenses were personal in nature because the defendant used the old system checks at the time when the new system was fully operational and all of the new accounts were to be processed through the new system, the check had been signed only by the defendant in clear violation of the SBC check signing policy and the consulting agreement, he issued the checks after he had assumed control of the corporate checkbook, and there were no invoices in SBC's records explaining the nature of the charges. That inference in turn would have then allowed the jury reasonably to conclude that purchases made at Urban Outfitters, Ridgefield Pet, Inc., Galleria D Arte, Vista Wine & Spirits, and Studentcity.com, as well as the cash advance, cash advance fee, late fees, and other purchases were not business related, despite the fact that no witness had testified about the nature of the purchases made with the credit card. See *State* v. *Crafts*, 226 Conn. 237, 245, 627 A.2d 877 (1993) ("[t]here is, in fact, no rule of law that forbids the resting of one inference upon facts whose determination is the result of other inferences" [internal quotation marks omitted]).

2

Count Six–American Express Credit Card 000

Additional facts pertaining to this count follow. During the defendant's tenure at SBC, his wife, Jamie Friend, and Peaceable Sales held an American Express credit card account ending in 000. From August 8, 2007, through August 28, 2007, the defendant made multiple purchases with the card amounting to $1134.12. The credit card statement for that period, introduced by the state at trial, reflected that the defendant had made purchases at Izumi Japanese Restaurant in Danbury ($99.15); Barcelona in Fairfield ($247.23); Bing's Car Service in Hopewell Junction, New York ($165); Koo Restaurant in Ridgefield ($108.10); Spring House Hotel on Block Island, Rhode Island ($195.80); Metro-North ($23); and several gasoline purchases made in New York and Connecticut ($295.84).

By the next statement cycle ending on September 28, 2007, the account had accrued $3605.93 in new purchases, a late payment fee, and a finance charge, bringing the total balance on the account to $4740.05. The

defendant submitted a copy of the monthly statement to SBC with certain charges having handwritten notations purportedly explaining their nature. Charges submitted for payment included "peripherals" at Verizon Wireless in Brookfield ($116.57); "computers" at Best Buy in West Hartford ($1262.92); transportation to New York City and back with Mincpac, Inc., ($296); a company dinner at Brazis Restaurant in New Haven ($41.88); several entertainment charges ($366.80); Microsoft Tech Support ($59); and multiple "fuel" purchases ($436.28).

On September 21, 2007, the defendant issued an SBC check payable to the order of "American Express" in the amount of $483.84. The check was issued using the old computer system and had only the defendant's signature. On September 26, 2007, the defendant issued another SBC check payable to the order of "American Express" in the amount of $483.84. The check also was issued on the old system, but it had two signatures; the defendant's and a signature resembling Dober's. On October 23, 2007, the defendant issued a third SBC check payable to the order of "American Express" in the amount of $2675.04. The check was issued on the new system and also had two signatures. At trial, however, Dober testified that neither of the two signatures was his.

By the next monthly statement, ending on October 28, 2007, the account had accrued $288.15 in new purchases and fees, bringing the total outstanding balance to $1385.48. The new purchases included a finance charge ($57.19); a purchase at Temple Grill in New Haven ($103.50); Vanger Garage in New York, New York ($26); and several fuel purchases ($101.46).

On November 19, 2007, the defendant issued an SBC check payable to the order of "American Express" in the amount of $1385.48. The check was issued on the new system and signed only by the defendant.

By the monthly statement ending on November 28, 2007, the account had accrued $2128.96 in new purchases and fees. The defendant submitted a copy of the monthly statement to SBC with certain charges having been blacked out. The remaining charges reflect that the defendant made purchases at Verizon Wireless ($552.05); Microsoft Support ($524.94); Ridgefield Office Supply in Ridgefield ($106.35); Arman Garage in New York, New York ($48); multiple fuel purchases ($339.49); and a finance charge ($31.83). At the bottom of the invoice, the defendant handwrote instructions, directing Gollinger to pay the entire balance and then deduct $526.30 from his paycheck.

On December 7, 2007, the defendant issued an SBC check payable to the order of "American Express" in the amount of $2128.96. The check was issued using the new system and signed only by the defendant.

On appeal, the defendant renews the argument we addressed in part I B 1 of this opinion, arguing that the state neither presented evidence that SBC had not authorized the payment nor proved that the charges were in fact personal rather than business expenses. We disagree.

As we concluded in part I B 1 of this opinion, the state presented sufficient evidence for the jury reasonably to infer that SBC had not agreed to compensate the defendant for his personal expenses. Furthermore, having reviewed the evidence in the case, we conclude that the state presented sufficient evidence to allow the jury reasonably to infer that the purchases made with the credit card were not legitimate business expenses. We reach this conclusion for the following reasons.

The jury reasonably could have inferred that the defendant had no SBC authorization to issue the checks and was trying to avoid detection because three of the five checks used had only one signature in violation of the company policy and the consulting agreement. Such an inference is further supported by Dober's testimony at trial that he did not sign the remaining two checks.

Moreover, the jury reasonably could have rejected the defendant's notations on the statements as illegitimate on the basis of a simple comparison between the history of the charges and corresponding payments made by the defendant. The evidence clearly shows that as of August 28, 2007, the account had a balance of $1134.12. The defendant issued two SBC checks, presumably to pay for business expenses, against these charges for a total of $967.68, leaving an unpaid balance of $166.44.[21] The September 28, 2007 statement reflects that the defendant had made new charges totaling $3605.93. Out of that total, his notations identified $2675.04 as supposedly legitimate business expenses, and the defendant issued an SBC check for the corresponding amount, leaving an unpaid balance of $1097.33. At that point, the only reasonable inference that could have been made is that the defendant had paid for all legitimate business expenses up to date, and the remaining balance, therefore, represented personal expenses ineligible for compensation. The October 28, 2007 statement reflects that the defendant had made $288.15 in new charges, compelling a reasonable inference that no more than the total of the new charges in the October statement can potentially qualify as a business expense. The evidence, however, clearly shows that the defendant issued a company check totaling $1385.48—the exact sum of the new charges reflected in the October statement and previously unpaid balance.[22] On the basis of this comparison, and the inference that the defendant was trying to avoid detection by issuing three checks with one signature and two checks with suspect signatures of Dober, the jury reasonably could have concluded that the defen-

dant's invoices were not credible and rejected the defendant's theory of defense.

## C

The defendant next claims that there was insufficient evidence to support his conviction of seven counts of larceny in the third degree in violation of § 53a-124 (a) (2).[23]

### 1

### Count Eight—Pite Law Office, LLC

Additional facts pertaining to this count follow. As we previously stated in part I A 1, during the defendant's tenure at SBC, David Pite had been the defendant's counsel in his negotiations over the Ridgefield Farms' outstanding debt to Webster Bank. On October 30, 2007, Pite Law Office, LLC (law office) sent a $1050 invoice to SBC for "legal services rendered from June 1, 2007, through October 31, 2007."[24] The specific charges were detailed as "[t]elephone conferences with Attorney Gfeller and her associate regarding [SBC] checks, pleadings, court notices and collection settlement negotiations for doubtful accounts. Review of agreements and business restructuring." On November 19, 2007, the defendant issued the law office an SBC check for the full amount. The check was issued on the new computer system and had only the defendant's signature.

On December 1, 2007, the law office sent a $962.50 invoice to SBC for "legal services rendered from November 1, 2007, through November 30, 2007," regarding the SBC "[a]cquisition."[25] The invoice detailed the charges as "[a]dditional telephone conferences with Attorney Rose regarding [SBC] real estate holdings and Food Terminal Market structure. Drafted release as requested and correspondence to Bank Counsel." On December 12, 2007, the defendant paid the invoice with an SBC check signed by the defendant only.

On January 8, 2008, the defendant, purportedly acting on behalf of SBC, signed a retainer agreement with the law office to "represent [SBC] in the following matters: general corporate matters and litigation; including Vande Rose Foods, LLC and Edart Trucking disputes." The agreement called for an initial retainer fee of $2500 to be paid by SBC to the law office. On January 11, 2008, the defendant issued an SBC check in the amount of $2500. The check was issued on the new system and had the defendant's signature only.

At trial, when asked to explain the nature of the charges in the December 1, 2007 invoice, Pite testified that the charges reflected the work he had done "in connection with the Vande Rose litigation . . . ." Pite further testified that he started working on the Vande Rose matter "in the fall," 2007, and that Vande Rose "just didn't sue [SBC] until January of 2008." As to the October 30, 2007 invoice, Pite admitted that Attorney

Gfeller, whose name appeared in the invoice, was, at the time, an attorney for Webster Bank. In addition, when asked as to why the retainer agreement had not been signed by SBC president and owner Bawarsky, Pite explained that the defendant asked him "to do it and said that he was authorized to sign" the retainer on behalf of the company. Ultimately, Pite testified that he billed SBC for his services because he "must have done work [for SBC]." He added, however, that "because [he] felt bad having to bill it," he "courtesied" SBC some of his time in the invoices.

The state presented testimony of Hecht who had been representing SBC and Bawarsky personally at the time. Hecht testified that Pite had been authorized to represent SBC in the Vande Rose dispute in January, 2008, "on the condition that [the defendant] was going to pay Mr. Pite's legal fees." Hecht specifically testified that he had informed Pite of this condition during a telephone call he had made on January 18, 2008, and in an e-mail he had sent to Pite following the telephone call. The e-mail, which was entered at trial as a full exhibit, stated, inter alia, the following: "This will confirm our telephone conversation earlier today regarding the suit in Federal Court by Vande Rose against [SBC] and [the defendant]. You have confirmed that [the defendant] has hired you to appear on behalf of both defendants. You also indicated that you believe that Vande Rose will be withdrawing the counts directed against [the defendant] personally. I represent Henry Bawarsky, sole stockholder of [SBC]. He has no objection to you appearing on behalf of [SBC], with the understanding that [the defendant] *is responsible for your fees*." (Emphasis added.)

In his testimony, Pite disputed Hecht's recollection of the terms of the agreement. He acknowledged that he had received the e-mail from Hecht, but testified that, once he had realized that the terms in the e-mail had been stated inaccurately, he called Hecht and informed him of the inaccuracy. To support Pite's testimony, the defense produced a copy of Hecht's e-mail, bearing Pite's handwritten note purportedly made during a phone call Pite had made following the receipt of the e-mail, correcting Hecht's understanding of the terms of the agreement.[26]

In his brief, the defendant argues that, even if all of the evidence presented by the state were to be credited by the jury, it was nevertheless insufficient to sustain his conviction on this count. Specifically, the defendant argues that the state "was required to prove not only that [SBC] paid Attorney Pite, but that any such payments were for work for which [SBC] had not agreed to pay." We are not persuaded.

First, the jury reasonably could have concluded that it was the defendant who was responsible for paying Pite's legal fees accrued in connection with the Vande

Rose litigation. At trial, Hecht testified that that was his understanding of the agreement. The jury, of course, was free to credit his testimony over Pite's testimony to the contrary. Thus, the jury reasonably could have concluded that the retainer fee of $2500 as well as the December 1, 2007 invoice for $962.50 that Pite had identified at trial as having been prepared in connection with Vande Rose matter had not been authorized by SBC.

Second, even if the jury were to determine that Pite had been retained by SBC in January, 2008, making it responsible for paying his fees, the jury reasonably could have concluded that charges from prior to that time were not legitimate. Furthermore, as is the case in other counts, the checks were signed by the defendant only despite the clause in the consulting agreement explicitly requiring a written authorization by Bawarsky before any funds could be paid out to a third party. Additionally, Pite had not been formally retained to provide legal services to SBC until January, 2008; by that time, however, Pite had billed SBC on two separate occasions. From that evidence, the jury reasonably could have inferred that Bawarsky had not authorized the payments of the two invoices, and that Pite had not been retained by SBC to provide legal services at the time, despite his testimony that he "must have done work [for SBC]." The jury also reasonably could have inferred that the post hoc creation of the January retainer agreement had been done by the defendant in an attempt to legitimize his previous payments to Pite. Moreover, the jury reasonably could have questioned the likelihood of Pite representing SBC in a complicated "litigation of a large bill" concerning a "great amount of money," for approximately five months without any formal agreement. This inference is furthered strengthened by the fact that Bawarsky had an attorney who had been representing his interests at the time.

Finally, the jury reasonably could have inferred that the services SBC had been billed for in the October 30, 2007 invoice had not been performed for its benefit, but rather for that of the defendant personally. The invoice clearly states that the charges stem from conferences with an attorney from Webster Bank "regarding [SBC] checks, pleadings, court notices and collection settlement negotiations for doubtful accounts. Review of agreements and business restructuring." At trial, Pite testified that he had represented the defendant in the negotiations with the Webster Bank that resulted in the signing of the forbearance agreement on October 22, 2007. The jury also heard testimony that the defendant had paid his debt to Webster Bank with SBC checks. In addition, the forbearance agreement specified that Webster Bank had "commenced a collection action" against the defendant. On the basis of that evidence, the jury reasonably could have inferred that the charges in the October 30, 2007 invoice reflected legal services

that had been performed for the defendant personally.[27]

2

Count Nine–U.S. Bank Ridgefield Farms Credit Card

Additional facts pertaining to this count follow. Ridgefield Farms held a credit card issued by U.S. Bank from prior to 2005. At trial, the representative of the bank, John Shaw, testified that approximately in September, 2007, the bank suspended the credit card account because no payments had been made for at least ninety days preceding the suspension. Shaw further testified that the unpaid balance on the account equaled $3721. On November 19, 2007, the defendant issued an old system SBC check payable to the order of U.S. Bank in the amount of $3721. The check was handwritten and signed only by the defendant.

In his brief, the defendant renews the argument we addressed in part I A 1 of this opinion, arguing that the state did not "put on any evidence suggesting that [SBC's] payments did not result in a corresponding reduction of [SBC's] debt to Ridgefield Farms." Once again, we are not persuaded by the defendant's argument.

As we concluded in part I A 1 of this opinion, the jury reasonably could have inferred that the defendant acted without SBC's consent by issuing a handwritten company check with only his signature. In addition, on the basis of the testimony and evidence presented at trial, the jury also reasonably could have determined that SBC's debt to Ridgefield Farms did not reach the extent claimed by the defendant or that it did not exist at all.

3

Count Ten–U.S. Bank Visa Credit Card

Additional facts pertaining to this count follow. During his tenure at SBC, the defendant held a personal credit card issued by the U.S. Bank. From August 4, 2007, through September 5, 2007, the defendant made multiple purchases with the card, which amounted to a total of $5331.85. The credit card statement for that period, introduced by the state at trial, reflected that the defendant made purchases at American Airlines ($298.60); Massage Envy Country ($49); Millilo Farms in Ridgefield ($39.63); Impark in New York, New York ($33); Express in White Plains, New York ($61.81); The Gap in White Plains, New York ($82.06); Bloomingdale's in White Plains, New York ($33.24); Nordstrom in White Plains, New York ($98.69); Barney's in White Plains, New York ($56.61); Fandango.com ($33); Manisses/1661 Inn on Block Island, Rhode Island ($836.20); Caraluzzi's in Wilton ($94.99); Hi Speed Ferry, Rhode Island ($67.50); Ridgefield Liquor Shop in Ridgefield ($43.98); Dead Eye Dicks on Block Island, Rhode Island ($95.92); Stop & Shop in Ridgefield ($49.73); Aldo's Moped, Inc.

on Block Island, Rhode Island ($66); The Moped Man on Block Island, Rhode Island ($69.85); Trader Joe's in Danbury ($110.67); Verizon Wireless ($1059.87); Bed Bath & Beyond in Danbury ($211.98); The Sports Authority in Danbury ($195.96); The Ridgefield Supply in Ridgefield ($54.02); Shell Oil in Cross River, New York ($88.70); Macy's in Danbury ($580.31); Luc's Café Restaurant in Ridgefield ($112.28); Kohl's in Ridgefield ($42); Progressive Insurance ($500); and Comcast Cable ($266.25). During the same period, the defendant also incurred a finance interest charge of $219.67.

On September 7, 2007, the defendant issued an SBC check payable to the order of "Visa" in the amount of $2849.25. The check was issued using the old computer system, the corresponding credit card account number was handwritten in, and the check had only the defendant's signature.

On appeal, the defendant renews the argument we addressed in part I B 1 of this opinion, arguing that the state neither presented evidence that SBC had not authorized the payment nor proved that the charges were in fact personal rather than business expenses. We disagree.

As we concluded in part I B 1 of this opinion, the state presented sufficient evidence for the jury reasonably to infer that SBC had not agreed to compensate the defendant for his personal expenses. Similarly, we conclude that the state presented sufficient evidence, in the form of the credit card statement, for the jury, using its common sense and experiences, reasonably to infer that the charges were personal. Moreover, the jury reasonably could have concluded that, by not adhering to the SBC policy requiring two signatures and the terms of the consulting agreement, the defendant had attempted to avoid detection because the purchases were not legitimate business expenses.

4

Count Eleven–Exxon Credit Card

Additional facts pertaining to this count are as follows. The defendant's wife held an Exxon Mobile credit card issued by the Citi Bank. During the defendant's tenure at SBC, the card was being used continuously to make purchases at 80 Bedford Road in Katonah, New York ($748.42); 2507 Albany Avenue in West Hartford ($939.93); 31 Danbury Road in Ridgefield ($150.02); 200 Sargent Drive in New Haven ($94.89); Route 35 & Bouton Road in South Salem, New York ($138.24); 30 South Kinderkamack Road in Montvale, New Jersey ($105.61); 680 East Main Street in Mount Kisco, New York ($5.14); 192 North Bedford Road in Mount Kisco, New York ($20.01); 681 Piermont Road in Closter, New Jersey ($69.30); and 209 Route 3 East in Secaucus, New Jersey ($40.13).

During that period, the defendant issued four SBC

checks payable to the order of "Exxon Mobil."[28] The first check was issued on October 11, 2007, using the old computer system. The check was in the amount of $253.90 and was signed by the defendant only. The second check was issued on October 18, 2007, using the new system. That check was in the amount of $475.51 and had the defendant's signature and a signature resembling Dober's. At trial, however, Dober did not recognize the signature as his. The third check was issued on November 19, 2007, also using the new system. It was in the amount of $326.54 and signed only by the defendant. The last payment was made by an old system check issued on December 24, 2007. It was handwritten in the amount of $730 and had only the defendant's signature.

At trial, the state presented testimony of Judith Ledoux, the bursar of the University of Hartford. Ledoux testified that in the fall of 2007, the defendant's sons were registered as students at the university. According to Ledoux, one of the sons had an automobile. She further testified that the files of the defendant's sons contained several off-campus addresses, including 18 Temple Street in Hartford, and Closter, New Jersey.[29] When asked whether she considered Albany Avenue as being close to the university's campus, Ledoux testified that she did.

In addition to the testimony of Ledoux, the state introduced testimony of Mel Cartoceti, an investigator for the state. Cartoceti testified that, according to his measurements, the distance between 2507 Albany Avenue in West Hartford and 18 Temple Street in Hartford was 4.31 miles. He also testified that the distance between 18 Temple Street in Hartford and the University of Hartford was 3.09 miles.

Finally, Cintron, who worked in the same office as the defendant at SBC, testified that, between September, 2007, and January, 2008, she had seen the defendant at SBC in New Haven every work day. Similarly, Greenfield testified that, as he understood it, the defendant had been at the SBC office "on a daily basis."

On appeal, the defendant argues that the state "offered no evidence with regard to what was purchased, by whom, or for what purpose." "Absent such evidence," he argues, "the inference the [state] asked the jury to draw—*i.e.*, that these charges represented personal purchases by [the defendant,] rather than [SBC] expenses—amounts to rank speculation, and is impermissible." (Emphasis in original.) We disagree.

First, the jury reasonably could have inferred that a credit card that had been issued to the defendant's wife, in fact, had been used by his wife and possibly other family members rather than by SBC employees. That inference is supported by the testimony of Ledoux and Cartoceti at trial that, at the time, in addition to residing

in Closter, New Jersey, the defendant's sons attended college and resided in a close proximity to 2507 Albany Avenue in West Hartford.[30] Furthermore, the jury reasonably could have inferred that the defendant's sons had been using the card on the basis of the regularity with which the charges at 2507 Albany Avenue had been made. The credit card statements introduced at trial clearly show that during the period from October, 2007, through December, 2007, the card had been used at this location twenty-three times. Similarly, the jury reasonably could have inferred that the twenty-four charges at 80 Bedford Road in Katonah, New York, also had not been made by the defendant, but rather someone else. In making this inference, the jury could have relied on its common experience and knowledge of the fact that Katonah, New York, does not lie between the defendant's residence in Ridgefield and the SBC office in New Haven where, according to the testimony of Cintron and Greenfield, he appeared every work day.

Second, having made this inference, the jury then reasonably could have concluded that the charges made by persons who had not been employed by SBC could not have been legitimate business expenses of SBC. In addition, the jury reasonably could have concluded that the purchases had been made for personal expenses on the basis of the evidence showing that the defendant clearly violated the consulting agreement and the company policy regarding two signatures on all SBC checks, and that he handwrote old system checks long after the new system had become fully operational.

In his brief, the defendant argues that, even if some of these charges were incurred at a gas station near the homes of the defendant's sons, the state "offered no evidence that . . . they were incurred for the sons' personal use, and were not [SBC] expenses." To support his argument, the defendant points to evidence at trial showing that his sons occasionally had performed some work at SBC in New Haven. Of course, the jury was free to reject the notion that SBC had chosen to compensate the defendant's sons for their work by paying the credit card account issued in their mother's name as implausible. In addition, the defendant lacked the necessary authority to make such payments under the terms of the consulting agreement.

5

Count Twelve–BMW Leasing Account

Additional facts pertaining to this count follow. During the defendant's tenure at SBC, his wife leased a BMW automobile from BMW Financial Services with a monthly payment of $539.51.

On November 30, 2007, the defendant issued an SBC check payable to the order of "BMW Financial Services." The check was in the amount of $1356 and signed only by the defendant. The defendant submitted to Gol-

linger a handwritten invoice that purported to list the mileage that he had driven for business purposes in September, October, and November, 2007. On the bottom of the invoice, the defendant wrote that he had travelled 2825 miles and then multiplied that mileage by $0.48 for a total of $1356. The invoice also included a handwritten notation, directing to "[m]ake check directly to BMW."

At trial, Gollinger testified that, in the process of creating an internal SBC account number to generate a company check on the new system, she entered the name of the defendant's wife as the leaseholder. According to Gollinger, when the defendant learned of that, "he got very upset with me because I put her name on that actual account, so I took it off."

Thereafter, on January 15, 2008, the defendant issued a second SBC check payable to the order of "BMW Financial Services." That check was in the amount of $394.56 and was signed only by the defendant. The defendant submitted a calendar page for December, 2007, with multiple handwritten entries purportedly listing the mileage he had travelled for business purposes during that month. According to the defendant's handwritten notation, he had travelled 822 miles for business during that month for a total of $394.56.

On appeal, the defendant argues that the state failed to present evidence that he "did not, in fact, use his wife's car to drive the number of miles he claimed for business purposes. Instead, the [s]tate asked the jury to infer, from the fact that the car was leased in his wife's name, that [the defendant] was stealing [SBC's] money to pay for his wife's car, rather than seeking 'reimburs[ment] for out of pocket . . . travel expenses,' pursuant to the [consulting agreement]. Absent any evidence to support it, any such inference was not only contrary to all the evidence, but pure speculation, and not permissible." We are not persuaded.

First, as is the case with other counts, the jury reasonably could have inferred that the payments to BMW Leasing were unauthorized by SBC because the company checks, although issued on the new system, lacked the required second signature in clear violation of the company policy and the terms of the consulting agreement regarding third party payments. In addition, the jury reasonably could have inferred that the defendant had been trying to avoid detection on the basis of Gollinger's testimony that the defendant became "very upset" and insisted that she remove any reference to his wife's name from the SBC computer system. Furthermore, the jury reasonably could have inferred that the defendant's invoices did not conform to the requirement of the consulting agreement for reimbursable business expenses to be accompanied by "*documentation* verifying said expenses." (Emphasis added.) The

invoices are handwritten, provide scant details and, on their own, offer no verification for the claims made therein.

Second, the invoices submitted by the defendant reflect that, between September and December, 2007, he had travelled 3647 miles for business purposes. At trial, however, both Cintron and Greenfield testified that the defendant appeared in the office on a daily basis. See *State* v. *Pearl*, 28 Conn. App. 521, 528–30, 613 A.2d 304 (1992) (finding that discrepancies between witnesses' observations and claims of overtime submitted for payment supported reasonable inference that defendant did not work hours claimed).

6

## Count Thirteen–Greater Huron Development Corporation/Keane & Beane, P.C.

Additional facts pertaining to this count are as follows. Prior to his tenure at SBC, the defendant, both personally and as one of the owners of Ridgefield Farms, had been Involved in a legal dispute brought by the Greater Huron Development Corporation (GHDC) in the United States District Court for the Southern District of New York. In that matter, the defendant was represented by Attorney David Glasser of the law firm Keane & Beane, P.C.

On August 10, 2007, the defendant entered a court approved settlement, resolving the dispute. Under the terms of the settlement, the defendant was to begin making monthly payments to GHDC in the amount of $1392.04. On September 10, 2007, the defendant issued an SBC check payable to the order of "GHDC" in the amount of $1392.04. The check was issued using the old computer system and was signed only by the defendant.

On December 10, 2007, Keane & Beane, P.C., sent an invoice to the defendant in the amount of $35,000. On January 1, 2008, the defendant issued a company check payable to the order of "Keane & Beane, P.C." in the amount of $1000. The check had only the defendant's signature.

In his brief, the defendant renews the argument we addressed in part I A 1 of this opinion, arguing that the state did not present evidence proving that SBC funds had not been used to satisfy the SBC's outstanding debt to Ridgefield Farms. Without such proof, he argues, the conviction on this count cannot stand. We disagree.

As we stated in part I A 1 of this opinion, the jury was free to disbelieve the defendant's theory of defense and conclude that SBC owed no money to Ridgefield Farms. In addition, in this count, the jury reasonably could have concluded that the defendant's clear violation of the company's policy requiring two signatures on all checks as well as his violation of the terms of the consulting agreement was indicative of his intent

to embezzle SBC funds to satisfy his personal debts.

7

Count Two–American Express Credit Card 009

Additional facts pertaining to this count follow. During his tenure at SBC, the defendant held an individual credit card account with American Express. The statement ending on August 8, 2007, reflects that the defendant made purchases at Wal-Mart in West Haven ($697.20); Maguire's Bayfront Restaurant in Ocean Beach, New York ($512.88); Gotomypc.com ($269.40); Fancy Food Show in New York City, New York ($120); made multiple fuel purchases ($456.97); paid a parking lot fee in New York City, New York ($19); and several E-ZPass charges ($245). The statement ending on September 9, 2007, reflects that the defendant made purchases at Tiger Direct.com ($2595.55); and a service charge with OnStar ($17.97).

On September 21, 2007, the defendant issued an SBC check payable to the order of "American Express" in the amount of $2828. The check was issued using the old computer system and was signed only by the defendant.

For the next statement cycle ending on October 8, 2007, the defendant submitted a copy of his monthly statement with the following charges claimed as business expenses: OnStar service charge ($20.09); "computers/printers" at Tiger Direct.com ($339.98); "file cabinets" at Wal-Mart ($240.92); La Quinta Inn in New Haven ($110.88); and several fuel purchases ($135.14).

On October 19, 2007, the defendant issued an SBC check payable to American Express in the amount of $847.01. The check was issued using the new computer system and it was signed by the defendant and Dober.

For the statement cycle ending on November 8, 2007, the defendant submitted a copy of his monthly statement with the following charges claimed as business expenses: Park Avenue Garage in New York City, New York ($33.13); Machine Shop in New York ($169); OnStar service charge ($20.09); Route 7 Grill in Great Barrington, Massachusetts ($1238.82); and multiple fuel purchases ($192.52).

On November 30, 2007, the defendant issued an SBC check payable to the order of "American Express" in the amount of $2486.43. The check was issued using the new system and was signed only by the defendant.

The statement cycle ending on December 8, 2007, reflects that the defendant made purchases at Tailgators Restaurant in Derby ($46.58); Croton Creek Steakhouse in Croton Falls, New York ($170.14); Romeo and Cesare in New Haven ($160); Morton's of Hartford in Hartford ($310.60); Joseph's Steakhouse in Bridgeport ($349.47); Cru Restaurant in New York City, New York ($327.44); Credit Alert membership fee ($119.99); Northwest Airlines "Passenger . . . Friend/Jamie" ($71.25); North-

west Airlines "Passenger . . . Friend/Phili[p]" ($71.25); Amtrak "Passenger . . . Stone/Richard" ($437); American Airlines ($1588.70); OnStar service fee ($20.09); E-ZPass ($155); Verizon Wireless ($564.96); L.L.Bean Direct ($269.45); Rio Suites in Las Vegas, Nevada ($422.19); PayPal ($25); a finance charge ($350.55); and multiple fuel purchases ($267.66).

On December 21, 2007, the defendant issued an SBC check payable to the order of "American Express" in the amount of $5157.64. The check was issued using the old system and was signed only by the defendant.

On this count, the defendant was charged with larceny in the first degree. The jury, however, acquitted him of that charge and of larceny in the second degree, but found him guilty of larceny in the third degree.

The defendant renews the argument we addressed in part I B 1 of this opinion, arguing that the state neither presented evidence that SBC had not authorized the payment nor proved that the charges were in fact personal rather than business expenses. We disagree.

As we concluded in part I B 1, there was sufficient evidence for the jury reasonably to infer that the defendant was to be reimbursed by SBC for only verified legitimate business expenses. Moreover, the jury reasonably could have inferred the lack of authorization in this count from the fact that three of the four checks used by the defendant did not have a second signature explicitly required by the company policy and the consulting agreement. In addition, the jury could also find support for that inference in the fact that the December 21, 2007 old system check was handwritten months after the new system became fully operational when all of the new accounts were supposed to be processed through the new system.

On the basis of this inference, the jury then reasonably could have concluded that the charges for the Credit Alert membership fee, Northwest Airlines ticket for the defendant's wife, a purchase at L.L.Bean Direct, and lodging in Rio Suites in Las Vegas, Nevada, reflected in the December 9, 2007 statement, were unauthorized personal expenses.[31] Furthermore, in the November 8, 2007 invoice the defendant claimed to have made business purchases totaling $1653.56. The corresponding SBC check, however, totaled $2486.43. On the basis of this evidence, the jury reasonably could have inferred that the difference of $832.87 between the invoice and the company check represented an unauthorized personal expense. The jury could find further support for this inference in the fact that all business expenses from the previous monthly cycle purportedly had been paid off in full by the defendant, negating any need to make an additional payment in November.

II

PROSECUTORIAL IMPROPRIETY

The defendant next claims that he was deprived of a fair trial by the prosecutor's statements made during the state's closing argument. Specifically, the defendant argues that the prosecutor, without any evidentiary basis, argued in his rebuttal that Bawarsky realized the defendant had been stealing from SBC and asked for his son's help to stop the theft. We are not persuaded.

The following additional facts are relevant to this claim. During the closing arguments, defense counsel tried to portray David Bawarsky as someone who had been trying to prevent the defendant from becoming the new owner of SBC because he wanted to preserve his own interests in the company. In furtherance of that theory, defense counsel argued to the jury that the defendant "was caused to be ejected from the company in late January, he was caused to be ejected and a name surfaced that had never surfaced in the negotiations or any legal document at all and that name as you now know is David Bawarsky, the son of Henry who had been thrown out of the company twenty years earlier . . . ."

During the rebuttal argument, the state addressed the defense's theory, and the following colloquy ensued.

"[The Prosecutor]: You heard argument about David Bawarsky coming in, he's been thrown out in the 80's, now some twenty years later he comes back, well David Bawarsky was Henry's son. *And isn't it okay for a father to ask his son for help*?

"[Defense Counsel]: Objection, Judge, there's no testimony that Mr. Bawarsky did, that Henry Bawarsky did.

"The Court: That's true. I will strike that. There's no evidence of that in this trial.

"[The Prosecutor]: But David pulls up and outs [the defendant]. *If you had an employee that was stealing from you would you keep him there*?

"[Defense Counsel]: Objection, Judge, I was precluded from arguing that Mr. Bawarsky was the victim, so how can [the prosecutor] now target that . . . [the defendant] was stealing from David Bawarsky. . . .

"The Court: I'm going to allow it, it's argument. It's appropriate argument." (Emphasis added.)

In addition, when arguing as to count four, the prosecutor stated the following: "Does it make much sense for [SBC] to be paying a commission to a consultant and then to his company, and then to the third company that was involved which is West Conn. Does that really make sense? Does it make logical business sense? Not if you know about it, but if you don't know because the only person who does know is the person writing the checks, you don't find out about it until later, then when you do *you shut it down*."[32] (Emphasis added.)

We begin our discussion by setting forth relevant

legal principles governing the claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 693, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 272 (2014).

To determine "whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that misconduct was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in the light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 561–63, 34 A.3d 370 (2012).

Furthermore, "prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent.

. . . By reason of his office, he usually exercises great influence [on] jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks [for] no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. [Although] the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, supra, 151 Conn. App. 693–94. With these principles in mind, we now turn to the defendant's claim.

On appeal, the defendant argues that "[t]hese assertions are simply, and undeniably, false—there was no evidence whatsoever that Henry Bawarsky *ever* believed that [the defendant] had stolen anything." (Emphasis in original.) Furthermore, he continues, these "false statements made by the [prosecutor] in closing here were severe and went to 'the very heart of the case'—i.e., whether Henry Bawarsky consented to the expenditures at issue." We are not persuaded.

Having reviewed the record, we conclude that none of the comments made by the state in its closing arguments was improper. The first comment made by the state— "[a]nd isn't it okay for a father to ask his son for help?"— clearly had been made in response to defense counsel's closing argument. See *State* v. *Kendall*, 123 Conn. App. 625, 643–44, 2 A.3d 990 (finding it proper for prosecutor, following defendant's closing argument, to highlight difference between state's version and defendant's version of facts and inferences properly drawn from those facts), cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

Similarly, the second comment—"[i]f you had an employee that was stealing from you would you keep him there?"—also had been made in response to the defense's alternative theory that David Bawarsky was trying to protect his own interests in SBC. In addition, this comment can be fairly inferred from the facts in the record. David Bawarsky did take control of the company in 2008 and forced the defendant out with the help of the New Haven police. See *State* v. *Prioleau*, 235 Conn. 274, 320, 664 A.2d 743 (1995) ("[c]ounsel may comment upon facts properly in evidence and upon *reasonable* inferences to be drawn from them" [emphasis in original; internal quotation marks omitted]).

As to the final comment—"you don't find out about it until later, then when you do you shut it down"—it too was not improper. At trial the state's theory of the

case had been that the defendant had the control of the company checkbook and used it to pay his personal debts. Thus it was proper for the prosecutor to comment that once the defendant's dealings had been discovered, he was forced out or "shut down." See id.

We conclude that the state's comments were not improper and, accordingly, need not consider whether any claimed impropriety deprived the defendant of his right to a fair trial. See *State* v. *Otto*, 305 Conn. 51, 76 n.19, 43 A.3d 629 (2012).

### III

### RIGHT TO SPEEDY TRIAL

Finally, the defendant claims that his "convictions should be vacated, because his right to a speedy trial was violated." Specifically, the defendant argues that "he was denied his right to a speedy trial when the [s]tate failed to bring him to trial until four and a half years after his arrest . . . ." Having reviewed the record in the case, we conclude that the defendant failed to preserve his constitutional claim at trial and, thus, can only prevail on his claim if he satisfies the test established by our Supreme Court in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[33]

The following additional facts and procedural history are relevant to this claim. On August 26, 2013, following his convictions at trial, the defendant filed a motion for "judgment of acquittal or, in the alternative, to dismiss for violation of his right to a speedy trial, or for a new trial." The court denied the defendant's motion. On April 4, 2014, the court issued a written articulation of its denial of the defendant's motion. The articulation sets forth the factual background as follows: The defendant "was arrested by warrant on December 18, 2008. Bond was set on the warrant in the amount of $350,000. [The defendant] posted the bond and was released from custody. His first court appearance was on January 5, 2009 . . . .

"On February 10, 2009, he appeared and entered not guilty pleas on all pending charges and elected to be tried by a jury. Attorney Norm Pattis entered an appearance on behalf of [the defendant] on January 5, 2009, and was his counsel until June 10, 2013. . . .

"On December 30, 2009, [defense counsel] filed a motion for a speedy trial. The case was assigned for jury selection on January 7, 2010. Subsequently, the statutory period for commencing [the defendant's] trial was tolled due to [defense counsel's] involvement in another trial. . . . [The defendant's] case was then assigned for jury selection on February 22, 2010."

On March 15, 2010, however, the defendant withdrew his motion for a speedy trial. The transcript of the March 15, 2010 hearing reveals the following colloquy:

"The Court: All right. Let me just indicate this is a

matter that was on the trial list. A motion for speedy trial was filed by counsel. It had been—the running of the statute had been tolled to this date because [defense counsel] was on trial for a good bit of that period and we set it down for today and what's happening today?

\* \* \*

"[Defense Counsel]: I would like to withdraw that motion, Judge. I've had discussions with the state and there was a supervised pre-trial last week. We are withdrawing our speedy trial motion after discussions with the state. In exchange the state is agreeing not to proceed on the thirty-two counts of forgery against [the defendant], but has reserved the right to proceed evidentially as to those facts on the notice of uncharged misconduct. We have reserved the right to oppose that at the time of trial, but the current—the case going forward would involve simply a one count claim of larceny in the first degree.

"And the reason that the parties reached this agreement with court supervision is that the—the entity that claims to be a victim, of course we dispute that it's a victim of anything other than the delusion of an interlope probe, but the entity that claims to be a victim went into bankruptcy and its records became the property of a trustee. The entity is now out of business and fifty-eight boxes of items that both sides need to look at now are reposed near the Foxboro Stadium in Massachusetts and we're just going to need some time for that, Judge.

"So in—you know, clearly we know chaos benefitted the defendant here, but the state wants the opportunity to look at those records and on the theory that it will A, do so and B, do the right thing, it's persuaded we're right and potentially drop this case, we thought it was in [the defendant's] interest to withdraw the speedy trial motion.

"The Court: All right. And then assuming that's done with good faith in that you wouldn't be—I mean, you have the right to tomorrow file a speedy trial again.

"[Defense Counsel]: There's no gamesmanship going on here.

"The Court: All right. So the understanding is

"[Defense Counsel]: Well, I can't say that, I'm always playing a game, but I mean I don't have any—I don't have any intent [to] reclaim it.

"The Court: I'm hoping this is a one-time—an exception to the usual.

"[Defense Counsel]: Yeah.

"The Court: And let me just ask you this, and the understanding is to give the state the opportunity to review the fifty-eight boxes and materials?

"[Defense Counsel]: Correct and we're going to look at it as well, Judge."

Following the March 15 hearing, the case was docketed six dates in 2011 and two dates in 2012. Finally, the jury selection commenced on April 26, 2013. The defendant did not file another motion for a speedy trial or indicate to the court "that he requested jury selection to commence in 2011 or 2012" by motion or correspondence. The issue reemerged in his August 26, 2013 motion to dismiss.

We begin our analysis of the defendant's claim by setting forth the governing legal principles. "Both the United States constitution and the constitution of Connecticut guarantee every criminal defendant the right to a speedy trial. See U.S. Const., amend. VI; Conn. Const., art. I, § 8. This guarantee protects against unreasonable delay between formal accusation and trial [that would threaten] to produce more than one sort of harm, including oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." (Internal quotation marks omitted.) *State* v. *Gibbs*, 254 Conn. 578, 609–10, 758 A.2d 327 (2000).

In Connecticut, "General Statutes § 54-82m[34] codifies a defendant's constitutional right to a speedy trial and confers on the judges of the Superior Court the authority to make such rules as they deem necessary to establish a procedure for implementing that right. Pursuant to that authority, the judges adopted Practice Book §§ 43-39 through 43-41."[35] (Footnote added.) *State* v. *Hampton*, 66 Conn. App. 357, 366–67, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001).

In his brief, the defendant argues that he is entitled to a dismissal of his case because of the "extreme delay and the severe prejudice [he] suffered as a result" of the delay. For the following reasons, we decline to review the defendant's claim.

It is settled that "[p]ursuant to § 54-82m, the filing of a motion for a speedy trial by the defendant is a prerequisite to dismissal of the information. . . . Therefore, before the defendant may move for dismissal, he must file a motion for a speedy trial. Furthermore, [Practice Book § 43-41] provides: Failure of the defendant to file a motion to dismiss prior to the commencement of trial shall constitute a waiver of the right to dismissal under these rules. Because a motion to dismiss is waived unless filed before the commencement of trial and a motion for a speedy trial must precede a motion for dismissal, logically a motion for a speedy trial must also be filed before the commencement of trial in order to be afforded a remedy under the rules." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 47 Conn. App. 91, 98–99, 702 A.2d 906 (1997),

cert. denied, 243 Conn. 960, 705 A.2d 552 (1998).

The record in this case establishes that the only motion for a speedy trial that had been filed was voluntarily withdrawn by the defendant on March 15, 2010.[36] Moreover, the record also indicates that the defendant failed to file his motion to dismiss before the commencement of trial as required by § 43-41. These facts lead us to conclude that, because he withdrew his speedy trial motion and did not file a timely motion to dismiss, "he is deemed to have waived his right to the statutory protection afforded by § 54-82m." Id., 99; see also *State* v. *Hampton*, 66 Conn. App. 357, 368, 784 A.2d 444, cert. denied, 259 Conn. 901, 789 A.2d 992 (2001).

Because the defendant failed to invoke the protection of § 54-82m, his constitutional claim has not been preserved at trial and thus can only be afforded review under the *Golding* analysis. See *State* v. *Rodriguez*, supra, 47 Conn. App. 99. To obtain review of an unpreserved claim pursuant to *Golding*, the defendant must present us with a record that is adequate for review and affirmatively demonstrate that his claim is indeed a violation of a fundamental constitutional right. See *State* v. *Elson*, 311 Conn. 726, 754–55, 91 A.3d 862 (2014). Having examined the record, we conclude, however, that it is not adequate for review.

In its articulation, the court found that the case "was docketed six dates in 2011 [and] two dates in 2012 . . . ." Critically, however, the record is silent on the issue of which party had requested the aforementioned continuances, and the defendant failed to seek an articulation or rectification thereof. Without knowing who requested the continuances and what rationale was provided as justification for these requests, our review of the defendant's claim would amount to a speculation in which we decline to engage.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was acquitted of one count of larceny in the second degree in violation of § 53a-123 (a) (2), and found not guilty as charged on one count of larceny in the first degree, but guilty of a lesser included offence of larceny in the third degree.

[2] Under the terms of the agreement, the defendant's pay would be reconciled on September 30 and December 31, 2007.

[3] Richard Greenfield was, at the time, the defendant's business partner in the planned acquisition of SBC. Greenfield signed an identical consultant agreement with SBC on August 3, 2007.

[4] On August 10, 2007, SBC also amended its bank signature policy to require two signatures on company checks. The defendant's signature appears on the form.

[5] Even though some aspects of the company's accounting were computerized, the software was described as "antiquated" at trial.

[6] Testimony at trial established that the defendant, Auger, Marcy Gollinger, Dober's sister, who was in charge of SBC payroll and accounts payable, and Ilka Cintron, an office worker at SBC, had the combination to access the safe.

[7] The new system used different SBC checks that were visually distinct from the checks used in the old system.

[8] The line of credit eventually was increased to $1.4 million. Greenfield was a personal guarantor of the trade credit.

[9] The defendant was also charged with thirty-three counts of forgery, but these charges were dropped by the state.

[10] Additionally, § 53a-119 (1) provides that "[a] person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody."

[11] General Statutes (Rev. to 2007) § 53a-122 (a) provides in relevant part that "[a] person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property . . . exceeds ten thousand dollars . . . ."

[12] The date had been determined by the terms of the forbearance agreement reached between the defendant and Webster Bank. Upon repayment, Webster Bank agreed, inter alia, to withdraw its action against Ridgefield Farms and to release an attachment on the defendant's home.

[13] Initially, the defendant attempted to satisfy the debt by sending SBC checks that had been issued to the order of Ridgefield Farms. Webster Bank, however, refused to accept these checks as payment because it was not the named payee.

[14] At trial, the defendant presented evidence that, prior to issuing the three checks directly to Webster Bank, he attempted to endorse the SBC checks issued to Ridgefield Farms in favor of Webster Bank, which it refused to accept as being contrary to its policy. On appeal, the defendant cites to this evidence as proof that he acted in good faith and only resorted to issuing the SBC checks directly to Webster Bank after it would not accept his previous forms of payment. This argument fails to explain why the defendant did not attempt to satisfy his debt to Webster Bank in the most logical and reasonable way—by depositing the checks to the Ridgefield Farms accounts first and then paying Webster Bank—but instead kept trying to satisfy his debt in a roundabout way. Thus, the jury reasonably could have discredited this evidence.

[15] Similarly, the jury was free to discredit the two documents submitted by the defendant. We note, however, that even if the jury were to consider the documents as proof of the debt's existence, almost $36,000 would still be left unexplained as the second document had the debt equal $50,339.49 by July, 2007. We further note that this difference is more than enough to meet the $10,000 threshold of § 53a-122 (a) (2).

[16] See footnote 8 of this opinion.

[17] Dober did confirm the authenticity of his signature on the check for $809.10.

[18] We note that Dober was not asked to authenticate the signature on the fifth check by the state. We further note that the sixth check that had two signatures had been signed by someone other than Dober, and the state did not seek to verify the authenticity of that signature at trial.

[19] In his brief, the defendant cites to *State* v. *Hedge*, supra, 297 Conn. 621, and *State* v. *Green*, 261 Conn. 653, 804 A.2d 810 (2002), as supporting his claim that the state did not present sufficient evidence to sustain his conviction on count four. Both decisions stand for the well-established principle of Connecticut jurisprudence that insufficient evidence cannot support a criminal conviction.

In *Hedge*, our Supreme Court held that in "the absence of any evidence that the defendant engaged in conduct reflecting an intent to sell drugs at some location within the proscribed area, the defendant is entitled to a judgment of acquittal" on that count. *State* v. *Hedge*, supra, 297 Conn. 661.

In *Green*, the court held that evidence showing that (1) the defendant and his companions at the scene of the crime were friends, (2) the defendant may have had a dispute with the victim who was a member of a gang, and (3) the simultaneous drawing of the guns by the defendant and his companions in an apparent response to a cry out to "shoot the [expletive]" was "too weak a foundation upon which to base an inference of an agreement" to commit murder. *State* v. *Green*, supra, 261 Conn. 672–73.

In his brief, however, the defendant provides limited analysis and does not explain how these particular cases offer support to his claim on appeal. The only conclusion that the defendant seemingly draws from both cases is that "the link between the facts proved with respect to count [four] and the inference the state asked the jury to draw was even more tenuous than the links the [court] found insufficient in *Hedge* and *Green*." For the reasons previously explained under this subsection, we disagree.

The defendant also cites *State* v. *Godfrey*, 39 Conn. App. 1, 663 A.2d 1117 (1995), appeal dismissed, 236 Conn. 904, 670 A.2d 1305 (1996) (appeal dismissed as moot because of death of defendant), as supporting his claim of insufficient evidence. In light of the procedural history of the case, we

conclude that its precedential value is questionable and, therefore, we follow our Supreme Court's well established precedent holding that on "appeal, we do not ask whether there is a reasonable hypothesis of innocence," but rather ask "whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Papandrea*, supra, 302 Conn. 349.

[20] General Statutes (Rev. to 2007) § 53a-123 (a) provides, inter alia, that "[a] person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property . . . exceeds five thousand dollars . . . ."

[21] We note that the evidence does not include a detailed business expense invoice corresponding to the August 28, 2007 statement.

[22] We also note that the record does not contain a detailed business expense invoice corresponding to the October 28, 2007 statement.

[23] General Statutes (Rev. to 2007) § 53a-124 (a) provides, inter alia, that "[a] person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property . . . exceeds one thousand dollars . . . ."

[24] The invoice separated the charges into two categories: (1) six hours charged at $175 per hour; and (2) four hours at "no charge."

[25] The invoice separated the charges into two categories: (1) five and one-half hours charged at $175 per hour; and (2) two and one-half hours at "no charge."

[26] Pite testified that the note read: "Call [Hecht] and told him erroneous, [SBC] only retained me. Told [the defendant] to get separate counsel."

[27] In his brief, the defendant argues that the state failed to present evidence "with regard to which of his services . . . Pite charged for, and which he provided at no charge" in his October 30, 2007 invoice. Absent such evidence, he argues, the jury was left "to speculate whether [Pite] billed [SBC] for services which [SBC] did not agree to pay, or for services for which [SBC] did agree to pay." We are not persuaded by this argument.

On redirect, Pite explained the "no charge" entry on the December 1, 2007 invoice by stating "I generally would do that when I'm charging someone, you know, many hours for looking over stuff that, you know, just as a courtesy, so I believe it was just probably reviewing documents or reviewing invoices or something that I felt, you know, even though it took time I gave him a break."

The jury reasonably could have interpreted Pite's explanation as simply meaning that it was his practice not to charge his clients for the full amount of time it had taken him to resolve a matter when he felt that it had taken him too long. This interpretation is further supported by Pite's statement during cross examination that he "courtesied that time because [he] felt bad having to bill [SBC] . . . ."

[28] Two checks were issued to the order of "Exxon Mobil," one to the order of "Exxon Inc.," and one to the order of "Exxon Processing Center."

[29] At trial, Ledoux was specifically instructed only to name the town and the state for the second address.

[30] We note that the sum of purchases made in West Hartford and Closter is sufficient to meet the $1000 threshold of § 53a-124 (a) (2).

[31] We note that the sum of the purchases reflected in the December 9, 2007 statement equals $5376.77, which is larger than the amount of the December 21, 2007 check by $219.13. In his brief, the defendant argues that, because the amount billed in the statement exceeded the amount paid by the defendant, the state had to but "failed to prove that [SBC] funds were used to pay any particular charge or charges." We reject the defendant's argument. There was sufficient evidence to allow the jury reasonably to conclude that the sum of unauthorized personal purchases was greater than the gap between the statement balance and the check.

[32] We note that the defendant failed to object to this comment. Nevertheless, the defendant's claim may be reviewed. See *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004) (unpreserved claims of prosecutorial impropriety reviewable without seeking review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 [1989]).

[33] In *State* v. *Golding*, supra, 213 Conn. 239–40, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed

to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

[34] General Statutes § 54–82m provides: "In accordance with the provisions of section 51–14, the judges of the Superior Court shall make such rules as they deem necessary to provide a procedure to assure a speedy trial for any person charged with a criminal offense on or after July 1, 1985. Such rules shall provide that (1) in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later, except that when such defendant is incarcerated in a correctional institution of this state pending such trial and is not subject to the provisions of section 54–82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) of this section and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1) of this section." Section 54-82m was amended by No. 07-217, § 194, of the Public Acts, which made technical changes to the statute that are not relevant to this appeal. For purposes of clarity, we refer to the current version of the statute.

[35] Practice Book § 43-41 provides: "If the defendant is not brought to trial within the applicable time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period. For the purpose of this section, good cause consists of any one of the reasons for delay set forth in Section 43-40. When good cause for delay exists, the trial shall commence as soon as is reasonably possible. Failure of the defendant to file a motion to dismiss prior to the commencement of trial shall constitute a waiver of the right to dismissal under these rules."

[36] In his brief, the defendant argues that his withdrawal of the motion for a speedy trial on March 15, 2010, did not constitute a "*prospective* waiver of the right." (Emphasis in original.) We are not sure what to make of the defendant's argument. The record is clear that the withdrawal of the motion was not intended to act as a prospective waiver; as the court specifically instructed the defendant that he had "the right to tomorrow file a speedy trial again." Thus, the defendant and the state knew that his withdrawal did not constitute a prospective waiver, and that he could reassert his right to a speedy trial at any time thereafter. He simply did not do so in a timely manner.